Avi Wagner (SBN #226688)
Jennifer N. Hinds (SBN #301804)
THE WAGNER FIRM
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 491-7949
Facsimile:   (310) 694-3967
Email: avi@thewagnerfirm.com

*Attorneys for Plaintiff Oxnard Manor LP
dba Oxnard Manor Health Center*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

| | |
|---|---|
| Oxnard Manor LP dba Oxnard Manor Health Center, a California Limited Partnership,<br><br>                                    Plaintiff,<br><br>        vs.<br><br>Hallmark Specialty Insurance Company, a Texas Corporation, and DOES 1-100,<br><br>                                    Defendant(s). | Case No.: **2:23-cv-01322-SPG-MAR**──────────<br>**Hon. Sherilyn Peace Garnett**<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) BREACH OF CONTRACT**<br><br>**(2) BREACH OF CONTRACT**<br><br>**(3) <s>(1) BREACH OF CONTRACT</s><br><s>(2)</s> BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>**(4) UNFAIR BUSINESS PRACTICES**<br><br>**(5)  UNJUST ENRICHMENT/ RESTITUTION**<br><br><s>(3) UNFAIR BUSINESS PRACTICES</s><br><br><s>(4)  UNJUST ENRICHMENT/ RESTITUTION</s><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Oxnard Manor LP dba Oxnard Manor Health Center ("Oxnard Manor" or "Plaintiff") files this Complaint against Defendant Hallmark Specialty Insurance Company (hereinafter "Hallmark"), and Does 1 through 100, and alleges as follows:

## SUMMARY OF THE ACTION

1. This insurance coverage dispute arises from Hallmark's and Does 1 through 100's failure and refusal to either defend and indemnify Oxnard Manor against a professional liability lawsuit falling within the scope of a Hallmark-issued long-term care organization liability policy and healthcare follow form excess policy.

2. In light of these facts, and as set forth below, Plaintiff is entitled to damages, including for attorneys' fees and the payment of settlement it incurred, as well as restitution, punitive damages, and attorneys' fees incurred, and to be incurred, in this action.

## THE PARTIES

3. Oxnard Manor is, and was at all times relevant herein, a limited partnership engaged in the business of operating a skilled nursing facility ("SNF") located at 1400 W. Gonzales Road, Oxnard, California 93036, within the County of Ventura.

4. Plaintiff is informed and believes and thereon alleges, that Hallmark is an insurer organized under the laws of Texas with its principal place of business in Dallas, Texas. Hallmark is licensed to transact business, and does transact business, in the State of California. The insurance ratings agency, A.M. Best, placed Hallmark under financial review with negative financial strength implications in October 2022. Similarly, its parent company, Hallmark Financial Services, Inc. has been under a significant strain during the relevant time period, with its stock price declining more

than ninety percent (90%) in the preceding several years. Such financial challenges provide important context for Hallmark's bad faith behavior herein. Similarly, Hallmark has been subjected to numerous regulatory complaints in regard to its insurance claim handling.

5. Plaintiff is ignorant of the true names and capacities of Defendants sued herein as DOES 1-100, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes and thereon alleges that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged and that Plaintiff's damages as herein alleged were proximately caused by their conduct.

6. Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, Defendants each were the agent, employee, partner, or joint venture of each other and of Defendants sued as DOES 1-100, inclusive, and in doing the things herein alleged each was acting within the course and scope of such agency, employment, or joint venture and with the permission and consent of such other Defendant.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over Hallmark because Hallmark is authorized by the California Department of Insurance to conduct business in the State of California, and in fact does conduct business in the State of California.

8. Venue is proper in this Court because Hallmark conducts business in the County of Los Angeles; Hallmark issued insurance contracts to Plaintiff in the County of Los Angeles; Plaintiff is located and maintains its office in the County of Los Angeles; Hallmark's obligations to Plaintiff were to be performed in the County of Los Angeles; and the insurance contracts at issue were produced in the State of California.

## SUMMARY OF FACTS ALLEGED

**The *Foreman* Suit**

9. In 2014, Plaintiff was one of dozens of named defendants in a putative class action lawsuit filed in Los Angeles County Superior Court, which was eventually compelled to private arbitration ("Foreman Suit").

10. The putative class in the Foreman Suit comprised residents of the SNFs named as defendants ("Putative Class Members").

11. None of the named plaintiffs in the Foreman Suit were ever a resident of Oxnard Manor, nor were they alleged to have been.

12. The Foreman Suit alleged, generally, that defendants, including Plaintiff, made misrepresentations to Putative Class Members in an Admission Agreement entered into upon admission to the defendant facilities.

13. The Foreman Suit further alleged that, as a result of these misrepresentations, putative class members were deprived of the value of the services they had bargained for from the SNFs.

14. The Foreman Suit pleaded four causes of action based on these allegations.

15. The first cause of action was for violations of the Consumer Legal Remedies Act, Civil Code § 1750 *et seq.*, which makes it illegal to use unfair or deceptive acts in consumer transactions. Under this cause of action, the complaint sought damages for the pecuniary harm resulting from payments made in reliance on misrepresentations in the Admissions Agreement.

16. The Foreman Suit's second cause of action was for violations of the Unfair Business Practices Act, Business and Professions Code § 17200, *et seq.* based on defendants' alleged misrepresentations and false claims as to the services to be provided to SNF their residents.

17. The Foreman's Suit third cause of action was for fraud based on defendants' allegedly fraudulent representations to the agencies regulating SNFs. The complaint sought damages incurred by relying on these fraudulent statements.

18. Finally, the Foreman Suit alleged generally that all defendants had violated SNF Residents' Rights under Health &Safety Code § 1430(b). The Foreman Complaint did not identify any specific rights that had allegedly been violated.

19. The Foreman Complaint's only allegation specific to Plaintiff is that, for a period of six months in 2013, Plaintiff's adjusted nursing patient hours per day were allegedly lower than those hours purportedly "expected" by the Centers for Medicaid & Medicare Services ("CMS"). However, even this allegation is a canard that grossly misconstrues CMS billing standards.

20. The Foreman Suit does not allege any facts specific to any violation of Resident's Rights allegedly committed by Plaintiff.

21. The Foreman Suit did not allege any cause of action or seek damages for any allged elder abuse or wrongful death.

## THE HALLMARK POLICIES

22. Hallmark issued two insurance policies to Oxnard Manor for the policy period of June 1, 2017~~8~~ to June 1, 2018~~9~~: (1) Long Term Care Organization Liability Policy number 75LTP000118-~~01~~ (the "17/18 Liability Policy"), and (2) Healthcare Follow Form Excess Policy number 75LTX000119~~-01~~ (the "17/18 Excess Policy") (collectively the "17/18 Policies").

23. Hallmark subsequently issued two insurance policies to Oxnard Manor for the policy period of June 1, 2018 to June 1, 2019: (1) Long Term Care Organization Liability Policy number 75LTP000118-01 (the "18/19 Liability Policy"), and (2) Healthcare Follow Form Excess Policy number 75LTX000119-01 (the "18/19 Excess Policy") (collectively the "18/19 Policies").

~~22.~~24. Aside from the coverage period, the terms of the 17/18 Policies and 18/19 Policies are substantially the same as relevant herein.

~~23.~~25. The 18/19 Liability Policy provides limits of $1,000,000 per professional liability claim.

~~24.~~26. The 18/19 Liability Policy insurance agreement A states in relevant part:

A. Claims Made Professional Liability:

The Company will pay on behalf of an insured, subject to the Limits of Liability and Deductible shown in Declarations Item 4A, those amounts an insured must pay as Damages in connection with a Claim resulting from a Medical Incident occurring on or after the Retroactive Date, provided the Claim is first made against an insured during the Policy Period or any applicable Extended Reporting period.

~~25.~~27. The 18/19 Liability Policy provides limits of $1,000,000 per general liability claim.

~~26.~~28. The 18/19 Liability Policy insurance agreement B states:

B. Claims Made General Liability:

The Company will pay on behalf of an insured, subject to the Limits of Liability and Deductible shown in Declarations Item 4B, those amounts an insured must pay as Damages for Bodily Injury…in connection with a Claim resulting from an Occurrence taking place on or after the Retroactive Date, provided the Claim is first made against an Insured during the Policy Period or any applicable Extended Reporting Period.

29.     The 18/19 Liability Policy defines "Claims Notice" to mean:

The Insured will, as a condition precedent to its rights under this Policy, give the Company notice in writing of any Claim made during the Policy Period or the Extended Reporting Period (to the extent applicable). Such notice will be given as soon as practicable but in no event later than ninety (90) days after an executive officer becomes aware of such Claim.

30.     The 18/19 Liability Policy defines "Notice of Circumstances" to mean:

If, during the Policy Period or during the Extended Reporting Period (to the extent applicable), the Insured becomes aware of any circumstance that may reasonably be expected to give rise to a Claim against the Insured and the Insured gives written notice to the Company of the subject circumstance and the reason the Insured anticipates that such may result in a Claim, with full particulars as to dates, persons and entities involved therein, then if any Claim related to such circumstance is subsequently made against such Insured and reported to the Company in accordance with Sub-Clause 1 above, Claims Notice, such Claim will be considered made at the time such notice of circumstance was first given to the Company.

27. 31.   The 18/19 Liability Policy defines "Claim" to mean:

An express demand for Damages resulting from a Medical Incident, Occurrence…covered by this Policy. An express demand for Damages shall include: (1) written notification received by an Insured of a demand or request for compensation to which this insurance applies, made by or on behalf of an injured party; (2) a civil legal action in which Damages to which this Damages to which this insurance applies are alleged;

28.32.  The 18/19 Liability Policy defines "Medical Incident" to mean:

(1) an actual or alleged act, error or omission in the course of rendering Administrative services or Healthcare Services,

(2) an actual or alleged violation by an insured of any Rights of Residents

…

29.33.  The 18/19 Liability Policy defines "Administrative services" to mean: "the planning, organizing, directing, and controlling of the Named Insured's Resident healthcare operations."

30.34.  The 18/19 Liability Policy defines "Healthcare Services" to mean: "services requiring specialized training, knowledge, and skill to care for or assist Residents, and that are performed by an insured who is licensed, trained, or qualified to perform such services in the jurisdiction where such services are rendered."

31.35.  The 18/19 Liability Policy defines "Bodily Injury" to mean: "injury to the human body, illness, sickness, disease, including death resulting from any of these at any time. Bodily Injury also includes mental anguish or mental injury resulting directly from a Bodily Injury."

32.36.  The 18/19 Liability Policy defines "Rights of Residents" to include: "any right granted to a Resident under any state law regulating the Named Insured's business as a Resident health facility…"

33.37.  The 18/19 Liability Policy includes an explicit duty to defend, which states:

The Company has the right and duty to defend any Claim covered by Insuring Agreements A., B., C. or H., with counsel of the Company's choice and in the manner the Company deems appropriate, even if the allegations of such Claim are groundless, false, or fraudulent. The Company will pay Defense Expenses in addition to the Limits of Liability listed in the Declarations for Insuring Agreements A., B., C. and H."

34.38.  Likewise, the 18/19 Excess Policy articulated a clear duty to defend: "[a]fter the exhaustion of the Underlying Insurance by actual payment thereunder, the Company shall owe a duty to defend any Claim."

35. Additionally, the 18/19 Excess Policy provides a duty to settle: "[t]he Company will pay on behalf of the Insured, up to the applicable Limit of Liability shown ITEM 3 of the Declarations, any loss, damages, judgments, settlements, and defense expenses in excess of the total Limits of Liability of all applicable Underlying Insurance which an Insured is legally obligated to pay as a result of a covered Claim."

36.

37.39.

### THE DESOTO CLAIM IS TENDERED TO AND ACKNOWLEDGED BY HALLMARK

38.40. On December 29, 2017, Kathleen DeSoto -- a resident at Oxnard Manor – allegedly fell from her bed when she was being cleaned and changed by staff, and later died.

39.41. Counsel for Plaintiff sent timely written notice of the potential DeSoto claim and demand for defense to Hallmark on January 30, 2018 ("DeSoto Claim").

40.42. Hallmark acknowledged receipt of the notice of claim on January 31, 2018.

41.43. Hallmark did not provide any substantive response to Plaintiff's tender of the claim for over a year.

### THE DESOTO COMPLAINT

42.44. On or around October 24, 2018, Kathleen DeSoto, by and through her Successors in Interest, Keven DeSoto, and Steven M. DeSoto, Kevin DeSoto, and Stephanie DeSoto-Suchy, individually (collectively, "DeSoto"), filed suit against Plaintiff ("DeSoto Complaint" or "DeSoto Suit").

43.45. The DeSoto Complaint alleged that Oxford Manor resident Kathleen DeSoto, a quadriplegic who required extensive assistance and weight bearing support, fell from her bed when she was being cleaned and changed by staff, and that she later died from her injuries.

44.46. DeSoto further alleged that the fall, and Ms. DeSoto's injury and subsequent death, were the result of wrongful action and/or inaction by Plaintiff and others.

45.47. Based on these allegations, DeSoto brought causes of action against Plaintiff and other parties for Elder Abuse and Neglect (Welf. & Inst. Code, § 15600 *et seq);* Violation of Resident's Rights (Health & Saf. Code, § 1430(b)); and wrongful death.

46.48. The DeSoto Complaint alleges that Plaintiff committed elder abuse and neglect by, *inter alia*, failing to "develop, implement, and modify care plans to provide MS. DESOTO the assistance and services that she required in light of condition and functional capacity" in violation of state and federal regulations.

47.49. The DeSoto Complaint also alleges eight specific ways in which Plaintiff purportedly violated Ms. DeSoto's personal Resident's Rights.

48.50. Finally, the DeSoto Complaint alleges that Plaintiff breached its duty to Ms. DeSoto by failing to retain "staff to provide her with necessary care and services based on assessment and recognition of her individualized care needs", resulting in her death.

49.51. The DeSoto Complaint does not allege that DeSoto suffered any injury or incurred any damages as a result of misrepresentations by Plaintiff.

## HALLMARK WRONGFULLY DENIES COVERAGE

50.52. On or about February 4, 2019 – over a year after being notified of the claim, and more than three months after the filing of the DeSoto Suit, Hallmark sent a letter to Plaintiff declining coverage of the Desoto Complaint ("February 2019 Denial").

51.53. Hallmark stated that the Complaint in the DeSoto Suit, which was tendered on October 25, 2018, during the 18/19 Policy period, constituted a "claim".

54. Hallmark contended, however, that because admitted the first notice of Ms. DeSoto's fall that thewas issued on January 30, 2018, the "Claim" tender of the DeSoto Claim constituted a "claim" under thewas made during the 17/18 Policy period.

52.55. Hallmark's response was ambiguous as to whether it considered the January 30, 2018 tender a "Notice of Circumstance".

53.56. Hallmark further wrongfully contended, however that the DeSoto SuitClaim falls outside of the 17/18 Policy period because it is somehow "related" to the Foreman Suit, whose claim was initially made in 2014.

54.57. In its denial, Hallmark represented that the Policy defines "Related Claims" as "two or more Claims *arising out of a single act, error or omission* that are logically or causally connected

by any common fact, circumstance, situation, transaction, event advice or decision."

55.58.  The Foreman Suit and the DeSoto Suit are Related Claims, Hallmark argued, because both allege understaffing and hiring of unqualified personnel at Plaintiff SNF, which supposedly constitute a common fact, circumstance, situation and decision.

56.59.  Hallmark did not identify any "single act, error or omission" that the two claims arose out of sufficient to render them "Related Claims" but instead remarked that both arose out of "the challenged decision and corresponding *acts*."

57.60.  Hallmark's February 2019 Denial also impermissibly ignored the DeSoto Complaint's unique allegations that Plaintiff's conduct that was negligent because it failed to consider Ms. DeSoto's individual needs and allegedly resulted in elder abuse and her wrongful death. *Financial Management v. Am. Intern*, 506 F.3d 922, 926 (9th Cir. 2007) (claims are not related where they are based on different wrongful conduct directed at separate clients and resulting in independent harms).

### HALLMARK DOUBLES DOWN ON ITS WRONGFUL DENIAL

58.61.  On or around March 29, 2019, AmWINS -- a wholesale global specialty insurance broker utilized by Plaintiff -- responded in substance to Hallmark's February 2019 Denial on behalf of Plaintiff, laying out grounds for coverage of the Desoto Complaint under the Policies.

59.62.  On or about June 6, 2019, Hallmark sent a letter acknowledging receipt and review of the AMWins March 29, 2019 letter.

60.63.  In the June 6, 2019 letter, Hallmark again declined coverage without providing any legitimate basis for denial and without meaningfully responding to the coverage grounds laid out in the AMWins March 29, 2019 letter.

61.64.  The June 6, 2019 letter provides no new grounds for denial of coverage not included in the February 2019 Denial, and otherwise includes no evidence that Hallmark made efforts to reasonably investigate Plaintiff's claims.

62.65.  As a result of Hallmark's wrongful denial of coverage, Plaintiff incurred and paid the costs to defend the Desoto Suit, including attorney's fees, court costs, and other associated Complaint costs.

### PLAINTIFF REACHES SETTLEMENT IN DESOTO SUIT

63.66.  On or around October 22, 2019, counsel for Plaintiff notified Hallmark via email that the parties had reached a provisional settlement in the DeSoto Suit for an amount that fell within the policy's claim limits, and demanded that Hallmark pay the settlement.

64.67.  Hallmark did not respond to Plaintiff's demand.

65.68.  As a result, Plaintiff was forced to pay the settlement amount and incurred substantial damages.

**HALLMARK'S DENIAL OF THE DESOTO CLAIM IS PART OF A BROADER PATTERN AND PRACTICE OF BAD FAITH CONDUCT**

66.69. Hallmark's unjustified denial of the DeSoto Suit based on its self-serving and unsupported conclusion that the disparate DeSoto and Foreman Suits constitute "Related Claims" is itself sufficient to demonstrate Hallmark's bad faith in discharging its duties.

67.70. Hallmark's bad faith is further evidenced by the fact that this improper relation of claims was not a one-off mistake, but part of a pattern and practice of how Hallmark treats claims tendered by insureds who have been named in more than one lawsuit.

68.71.  On or around February 3, 2020, Hallmark sent a letter declining coverage to San Mateo Healthcare & Wellness Centre, LP dba Burlingame Long Term Care D/P SNF ("San Mateo Healthcare") for a claim brought by resident Eric Love ("Love") for personal injuries sustained at a residential care facility after a fall ("Love Claim").  The basis for the denial was because the Love Claim purportedly arose out of the same allegations asserted against Plaintiff prior to the September 7, 2017 inception date of the Policy and Plaintiff was not an insured under the Policy at issue.  This denial was notwithstanding Hallmark's duty to only decline coverage for claims that were clearly not covered under the policy.

69.72.  In the February 3, 2020 letter, Hallmark declined coverage of the Love Claim based on nearly identical -- and similarly baseless -- grounds as those cited in Hallmark's February 2019 Denial of the DeSoto Suit.

70.73.  Hallmark did not focus on the allegations in the Love Claim, but summarily concluded that because San Mateo Healthcare had been named in the Foreman Suit, the Love Claim was a "Related Claim" to the Foreman Suit.

~~71.~~ 74. Upon information and belief, and as supported by Hallmark's declination of coverage of the Love Claim, Plaintiff alleges that Hallmark's wrongful denial of coverage and other wrongful conduct relating to the Desoto Complaint is one instance of a larger pattern and/or practice of misconduct by Hallmark.

## FIRST CAUSE OF ACTION

### (For Breach of Contract Against Hallmark and DOES 1-100)

~~72.~~ 75. Plaintiff incorporates and realleges the allegations in Paragraphs 1 through 68 as if the same were fully set out herein.

~~73.~~ 76. Plaintiff was insured under the valid insurance 18/19 Policies issued by Hallmark, which were in effect on the date the Desoto Complaint was filed.

~~74.~~ 77. Plaintiff paid consideration in the form of premiums for the 18/19 Policies, and has otherwise performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the 18/19 Policies.

~~75.~~ 78. Hallmark's 18/19 Policies imposed a duty upon Hallmark to defend and indemnify Plaintiff against the claims in the Desoto Complaint as well as an implied duty to reasonably settle these claims because they were clearly covered under the policy.

~~76.~~ 79. Hallmark breached its obligations under the 18/19 Policies including but not limited to: (1) denying Plaintiff's claim prematurely and without basis, reasonable good faith analysis or investigation even though the claims were clearly covered by the 18/19 Policies; (2) refusing to defend Plaintiff with respect to the Desoto Complaint; (3) refusing to satisfy a reasonable settlement in the Desoto Complaint as defined by Hallmark's contractual settlement obligations under the 18/19 Excess Policy (and/or implied by the Policies); and (4) otherwise denying coverage of the claims set forth in the Desoto Complaint in bad faith.

~~77.~~ 80. As a direct and proximate result of Hallmark's breach of its contractual obligations, Plaintiff was deprived of the benefits of the insurance coverage for which Hallmark was paid substantial premiums.

81. Plaintiff has suffered and continues to suffer damages as a result of Hallmark's breach of the 18/19 Policies, including defense costs, amounts paid to settle the Desoto Complaint, and other

damages.

## SECOND CAUSE OF ACTION

### (For Breach of Contract Against Hallmark and DOES 1-100)

82. Plaintiff incorporates and realleges the allegations in Paragraphs 1 through 68 as if the same were fully set out herein.

83. Plaintiff pleads in the alterative to the First Cause of Action, the same conduct by Plaintiff and Defendant, but as to the 17/18 Policies.

84. Plaintiff was insured under the valid insurance 17/18 Policies issued by Hallmark, which were in effect on the date the Desoto Complaint was filed.

85. Plaintiff paid consideration in the form of premiums for the 17/18 Policies, and has otherwise performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the 17/18 Policies.

86. Hallmark's 17/18 Policies imposed a duty upon Hallmark to defend and indemnify Plaintiff against the claims in the Desoto Complaint as well as an implied duty to reasonably settle these claims because they were clearly covered under the policy.

87. Hallmark breached its obligations under the 17/18 Policies including but not limited to: (1) denying Plaintiff's claim prematurely and without basis, reasonable good faith analysis or investigation even though the claims were clearly covered by the 17/18 Policies; (2) refusing to defend Plaintiff with respect to the Desoto Complaint; (3) refusing to satisfy a reasonable settlement in the Desoto Complaint as defined by Hallmark's contractual settlement obligations under the 17/18 Excess Policy (and/or implied by the Policies); and (4) otherwise denying coverage of the claims set forth in the Desoto Complaint in bad faith.

88. As a direct and proximate result of Hallmark's breach of its contractual obligations, Plaintiff was deprived of the benefits of the insurance coverage for which Hallmark was paid substantial premiums.

~~78.~~ 89. Plaintiff has suffered and continues to suffer damages as a result of Hallmark's breach of the 17/18 Policies, including defense costs, amounts paid to settle the Desoto Complaint, and other damages.

## ~~SECOND~~ THIRD CAUSE OF ACTION

### (For Bad Faith / Breach of the Implied Covenant of Good Faith and Fair Dealing Against Hallmark and DOES 1-100)

~~79.~~90.  Plaintiff incorporates and realleges the allegations in Paragraphs 1 through 75 as if the same were fully set out herein.

~~80.~~91.  The Hallmark Policies, by nature of the agreements and by operation of law, include an implied covenant of good faith and fair dealing that no party to the agreement will take any action which would deprive or jeopardize the rights or benefits of the other party under the agreement.

~~81.~~92.  Hallmark breached its duty of good faith and fair dealing owed to Plaintiff by, including but not limited to, unreasonably and in bad faith:

a.  Substantially delaying its response to Plaintiff's tender of coverage and failing to address the coverage arguments raised by Plaintiff;

b.  Failing to investigate and process Plaintiff's claim, including failing to diligently search for and consider evidence that supported coverage of the claimed loss, and failing to provide a well-researched explanation for its denial, instead supplying boilerplate and recycled language from other coverage denials;

c.  Wrongfully denying its obligation to defend Plaintiff and settle in the Desoto Complaint under the Policies even though the claims were covered by the Policies;

d.  Wrongfully denying its obligation to pay a reasonable settlement in the Desoto Complaint;

e.  Wrongfully denying its obligation to indemnify Plaintiff in the Desoto Complaint;

f.  Failing to pay for all of Plaintiff's covered damages;

g.  Placing its own financial interests ahead of the insured in violation of California's statutory, regulatory, and common law;

h.  Failing to give at least as much consideration to the interest of its insured as it

        gave to its own interest;

   i.  Withholding payment sums due and owing to Plaintiff; and

   j.  Compelling Plaintiff to institute this Complaint to recover amounts due under the Policies.

  82.93. Plaintiff alleges that Hallmark breached its duty of good faith and fair dealing by other acts and omissions of which they are presently unaware but which will be shown according to proof at trial.

  83.94. Upon information and belief, Hallmark's pattern of unfair practices constitutes intentional bad faith and evidences a conscious course of wrongful conduct in breach of the implied duty of good faith and fair dealing.

  84.95. Upon information and belief, Hallmark's actions were performed willfully and intentionally to deprive Plaintiff of benefits under the Policies and with a conscious disregard for Plaintiff's rights. Hallmark has thus acted with malice, fraud, and oppression.

  85.96. Upon information and belief, Hallmark's conduct was undertaken or approved by its officers or managing agents, who are and were responsible for claims supervision, operations, communications, and decisions. This unreasonable conduct was undertaken on behalf of Hallmark. Hallmark had advanced knowledge of the actions and conduct of said individuals and the conduct was ratified, authorized and approved by Hallmark, including managing agents whose precise identities are unknown to the Plaintiff at this time and therefore identified and designated as DOES 1 through 10.

  86.97. Viewing the totality of the circumstances surrounding Hallmark's conduct towards Plaintiff, Hallmark's conduct was, and continues to be, vexatious, unreasonable, and in bad faith.

  87.98. As a proximate result of Hallmark's unreasonable, vexatious, and bad faith conduct described above, Plaintiff has been damaged and has been forced to bring this action against Hallmark to enforce its rights. Hallmark is therefore liable to Plaintiff for attorneys' fees, witness fees and costs of Complaint reasonably necessary and incurred by Plaintiff in order to obtain the Policies' benefits.

  88.99. Hallmark intended for its conduct to cause injury to the Plaintiff. Hallmark engaged in despicable conduct carried out with a willful and conscious disregard for Plaintiff rights and/or

subjected Plaintiff to unjust hardship in conscious disregard of their rights. Hallmark's conduct constituted intentional misrepresentation with the intention of depriving Plaintiff of property, legal rights, and/or of causing other injury. Hallmark's conduct constitutes malice, oppression or fraud under California Civil Code section 3294, entitling Plaintiff to punitive damages in an amount appropriate to punish or set an example of Hallmark and deter further similar conduct.

## ~~THIRD~~ FOURTH CAUSE OF ACTION

**(For Unfair Business Practices in Violation of Cal. Bus. & Prof. Code Section 17200 Against Hallmark and Does 1-100)**

~~89.~~100.  Plaintiff incorporates and realleges the allegations in Paragraphs 1 through 85 as if the same were fully set out herein.

~~90.~~101.  The California Business and Professions Code Section 17200, et seq., prohibits any unlawful, unfair, or fraudulent business act or practice.

~~91.~~102.  Hallmark has violated § 17200 by, inter alia, denying in bad faith Plaintiff's claim for coverage in violation of California's Unfair Insurance Practice Act codified as California Insurance Code Section 790.03 (h).

~~92.~~103.  Upon information and belief, Hallmark has further engaged, and continues to engage, in a pattern of unfair and fraudulent business acts and practices by reproducing its bad faith breaches of its duty to Plaintiff in responding to other claims brought by other insureds, including, but not limited to, the Love Claim.

~~93.~~104.  As a direct and proximate result of Hallmark's unfair and fraudulent business acts and practices, Plaintiff has been damaged and is entitled to restitution in the amount of the premiums it paid Hallmark under the Policies.

## ~~FOURTH~~ FIFTH CAUSE OF ACTION

**(For Unjust Enrichment / Restitution Against Hallmark and DOES 1-100)**

~~94.~~105.  Plaintiff incorporates and realleges the allegations in Paragraphs 1 through 90 as if the same were fully set out herein.

~~95.~~106.  Hallmark was unjustly enriched at the expense of and to the detriment of Plaintiff because of its wrongful actions and omissions.

96.107. Specifically, Hallmark accepted and kept the premiums paid by Plaintiff for insurance coverage under the Policies while refusing to fulfill its obligations to Plaintiff under the Policies as detailed herein.

97.108. As a direct and proximate result of Hallmark's conduct, Plaintiff has suffered damages and is entitled to restitution in an amount to be proven at trial. Plaintiff seeks restitution from Hallmark and seeks an order from the Court to disgorge all monies paid to Hallmark.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Oxnard Manor LP dba Oxnard Manor Health Center prays for judgment against Defendant Hallmark Specialty Insurance Company as follows:

1. For general, compensatory damages, plus prejudgment interest and other damages according to proof;
2. For special and consequential damages;
3. For punitive and exemplary damages according to proof and as applicable under the law;
4. For restitutionary disgorgement of all profits Defendant Hallmark obtained as a result of unlawful, unfair, and/or fraudulent business practices;
5. For attorneys' fees and costs of suit herein;
6. For pre-judgment interest as provided for by applicable law; and
7. For such further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff Oxnard Manor LP dba Oxnard Manor Health Center demands a jury trial.

DATED: ~~January~~ April ___, 2023                THE WAGNER FIRM

By:_____
Avi Wagner
1925 Century Park East, Suite 2100

17

FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                Los Angeles, California 90067
                Telephone:   (310)491-7949
                Facsimile:    (310)694-3967
                Email:     avi@thewagnerfirm.com

*Attorneys for Plaintiff Oxnard Manor LP dba Oxnard Manor Health Center*