1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

OXNARD MANOR LP dba OXNARD
MANOR HEALTH CENTER, a California
Limited Partnership,

                          Plaintiff,

          v.

HALLMARK SPECIALTY
INSURANCE COMPANY, an
Oklahoma Corporation, and DOES 1-
100,

                          Defendants.

Case No. 2:23-cv-01322-SPG-MAR

**ORDER DENYING IN PART
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND
GRANTING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY
JUDGMENT
[ECF NO. 62]**

Before the Court is Hallmark Specialty Insurance Company's ("Defendant") Motion for Summary Judgment. (ECF No. 62). Plaintiff opposes and cross-moves for partial summary judgment. (*Id.*). Having considered the parties' submissions, oral arguments, the relevant law, and the record in this case, the Court GRANTS, IN PART, AND DENIES, IN PART, Defendant's Motion and GRANTS Plaintiff's cross motion.

I.   **BACKGROUND**

    A.   **Factual Background**

       The following summarized facts relevant to the instant motion are uncontroverted, unless otherwise stated.  *See* (ECF No. 62-1 (Joint Appendix of Facts "JAF")).[1]

       Plaintiff Oxnard Manor LP dba Oxnard Manor Health Center ("Plaintiff") is a skilled nursing facility.  (JAF 1).  As relevant herein, Defendant Hallmark Specialty Insurance Company ("Defendant") issued a liability insurance policy to Plaintiff effective from June 1, 2017, to June 1, 2018.  (JAF 2).  Defendant then issued a second liability insurance policy effective June 1, 2018, to June 1, 2019.  (JAF 3).  The policies included coverage for professional liability.  (JAF 4).

       1.   The 2017/2018 Policy

       In relevant part, Plaintiff's "Claims Made Professional Liability" policy provided coverage for claims resulting from a "Medical Incident."  (JAE 2 at 21).[2]  It defined "Medical Incident" as "(1) [a]n actual or alleged act, error or omission in the course of rendering Administrative Services or Healthcare Services; [and] (2) [a]n actual or alleged violation by an Insured of any Rights of Residents . . ."  (JAE 2 at 30).  "Rights of Residents" is then defined as "(1) any right granted to a Resident under any state law regulating the Named Insured's business as a Resident health facility; or (2) the Rights of Residents as included in the United States Department of Health and Welfare regulations governing participation of Intermediate Care Facilities or Skilled Nursing Facilities, regardless of whether the Named Insured's facility is subject to such regulations."  (JAE 2

---

[1] When determining a motion for summary judgment, the Court only considers evidence admissible at trial, though the form may differ at the summary judgment stage.  *Godinez v. Alta-Dena Certified Dairy LLC*, No. CV 15-01652 RSWL (SSx), 2016 WL 6915509, at *3 (C.D. Cal. Jan. 29, 2016).  The Court has reviewed the entire record, including the parties' JAF, objections, and evidence.  The Court discusses only the facts that are relevant to its decision.  To the extent that the Court relies on evidence that is the subject of an objection, the Court overrules the objection.  To the extent the Court does not rely on evidence objected to by the parties, the objections are overruled as moot.

[2] Page numbers reference the relevant CM/ECF number unless otherwise specified.

at 32–33).   However, the policy also included certain limits on liability and express exclusions.   For instance, it stated that "All Related Claims, whenever made, shall be deemed to be a single Claim, regardless of: (1) the number of Related Claims; (2) the number or identity of claimants; (3) the number or identity of Insureds involved or against whom Related Claims have been made or could be made; (4) whether the Related Claims are asserted in a class action or otherwise; or (5) the number and timing of the Related Claims, even if the Related Claims comprising such single Claim were made in more than one Policy Period."  (JAE 2 at 25).   It further stated that "All Related Claims will be treated as a single Claim made when the earliest of such Related Claims was first made, or when the earliest of such Related Claims is treated as having been made in accordance" with the policy.  (JAE 2 at 25).   The policy defines "Related Claims" as "two or more Claims arising out of a single act, error, or omission that are logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision."  (JAE 2 at 32).

### 2.   The *Foreman* Action

On October 7, 2014, before Plaintiff was insured under the policies at issue in this action, a separate action was instituted against Plaintiff and numerous other defendants in Los Angeles County Superior Court ("the *Foreman* Action").  (JAF 18).  A first amended complaint was filed in the *Foreman* Action on February 26, 2015.  (JAF 18a).  Plaintiff first appeared in the *Foreman* Action on February 2, 2015.  (JAF 20).  The *Foreman* Action alleged that Plaintiff "conceived and implemented a plan to wrongfully increase business profits at the expense of the rights and health of residents such as Plaintiff, and others similarly situated through the chronic understaffing and under-funding of the defendant facilities which prevented the defendant facilities from ensuring their residents' statutory right to live in adequately staffed facilities that would meet the needs of residents."  (JAF 22c).  While the *Foreman* Action did not allege any specific physical injury to any resident, it did allege that "failing to maintain sufficient staffing may result in death or serious physical harm to residents."  (JAF 22e).  It also alleged that residents of the nursing

facilities, including Defendant, suffered economic harm in the form of lost payments and services, due to reliance on misrepresentations made in admission agreements. (JAF 50).

### 3. The *DeSoto* Action

On October 24, 2018, the *DeSoto* Action was filed by DeSoto's heirs. (JAF 45). The Action alleged that DeSoto began residing at Plaintiff's facility in 2017. (JAF 45–46). While residing at the facility, DeSoto was bedbound, totally dependent on staff for all transfers and mobility, as well as for dressing, toilet use, and bathing. (JAE 10 at ¶ 31). According to the *DeSoto* Complaint, on December 29, 2017, Plaintiff's staff were cleaning and changing DeSoto and, in that process, they positioned her so that she was lying on her left side such that she fell forward and off the bed, landing face down on the floor. (JAE 10 at ¶ 33). The *DeSoto* Complaint alleged that she fractured both arms, dislocated both shoulders, suffered lacerations to her forehead, and likely suffered intra-abdominal injuries from the fall. (JAE 10 at ¶ 34). The *DeSoto* Complaint further alleged that she died the next day, December 30, 2017, as a result of her injuries. (JAE 10 at ¶ 35).

The *DeSoto* Action also alleged that "one of the reasons [Defendant] failed to meet Ms. DeSoto's need for care and basic services . . . is that [Defendant] made a conscious choice to understaff the nursing home, in both quantity and quality of nursing personnel. The decision to understaff as made at the corporate level . . . in order to increase the profitability of the [skilled nursing facility] . . . integral to this plan was the practice and pattern of [Defendant] staffing the facility with an insufficient number of care personnel . . . [which] was designed to reduce labor costs and to increase profits." (JAF 22c). The *DeSoto* Action further alleged that "this corporate policy to not maintain sufficient staffing as required by law was developed and implemented with the conscious disregard for the likelihood of physical harm and injury to those who it is the business to protect . . . ." (JAF 22c). The Complaint also alleged that Defendant and its managers "knew that by understaffing their facility . . . they were putting the facility's residents (including Ms. Desoto) at risk for known, harmful, life threatening conditions, including falls." (JAF 22c).

Based on these allegations, DeSoto's heirs filed causes of action for: (1) elder abuse and neglect; (2) violation of resident's rights under the California Health and Safety Code; and (3) wrongful death. (JAE 10). While the *DeSoto* Complaint alleged various types of knowing or willful conduct, it also pled in the alternative that Defendant engaged in negligent conduct by allowing the wrongful death of DeSoto. (JAE 10 at ¶¶ 74–79).

On January 30, 2018, shortly after DeSoto's death and approximately nine months before the *DeSoto* action was filed, Plaintiff notified Defendant of the DeSoto family's request for medical records. (JAF 6). On October 25, 2018, after the *DeSoto* Action was filed, Plaintiff, through its agent AmWins, tendered the *DeSoto* Complaint to Defendant. (JAF 79). On November 2, 2018, Lewis Brisbois began defending all the defendants in the DeSoto action, including Plaintiff. (JAF 81). This defense included the filing of an answer and the drafting of an initial report provided to Defendant. (JAF 83, 84). However, on February 15, 2019, Cowdrey Jenkins was substituted in as counsel for Oxnard. (JAF 99). Defendant represents that it does not know whether it ever terminated Lewis Brisbois's representation of Plaintiff in *DeSoto*. (JAF 98).

Defendant officially declined the tender for the *DeSoto* Action on February 4, 2019, and reiterated its denial of coverage in June 2019 in response to a further letter from Plaintiff's agent. (JAF 12, 13, 96). Defendant represents that it retained experienced coverage counsel to obtain input regarding whether it had an obligation to provide a defense. (JAF 26). Defendant states that in reaching its decision to deny coverage and a defense, it compared the *DeSoto* Complaint with the policy language. (JAF 28). Defendant also states that it did some further investigation during which it discovered other lawsuits by residents of facilities run by the same individual who managed Plaintiff. (JAF 32). One of these lawsuits Defendant states it learned of during this investigation was the *Foreman* Action.[3] (JAF 34). Defendant states that it then compared the allegations in *Foreman* and

---

[3] Plaintiff disputes any contention by Defendant that this was the first time Defendant learned of the *Foreman* Action. However, for the purposes of this motion, the Court need not wade into that dispute.

*DeSoto* and determined the two were related claims under the policy such that the *DeSoto* claim was "first made" prior to the inception of the 2017/2018 policy. (JAF 36). Defendant also states that it determined that coverage was barred under several exclusions in the policy. (JAF 37). In a March 2019 letter to Defendant, Plaintiff's agent contested Hallmark's February 2019 denial of coverage and refusal to provide a defense of the *DeSoto* Action, arguing in part that *Foreman* did not qualify as a related action under the policy. (JAE 8). On August 1, 2019, Plaintiff again requested that Defendant reconsider its coverage determination and once again argued that the *DeSoto* and *Foreman* Actions should not be considered related under the policy language. (JAE 9). However, Defendant continued to deny coverage, which ultimately led to the filing of the instant suit.

The *DeSoto* Action proceeded to mediation in October 2019, and Defendant again stated that it would not attend the mediation because of its position that no coverage was owed. (JAF 15). Several months after mediation, on January 13, 2020, the parties to the *DeSoto* Action finalized a settlement agreement, which set forth a payment schedule, with the final payment due by November 15, 2021. (JAE 15).[4] As of February 19, 2020, Plaintiff made its first payment under the settlement agreement. (JAF 17). The settlement agreement stated that the Los Angeles Superior Court "shall retain jurisdiction over the matter" and provided that, should a dispute arise under the settlement agreement or should it not be fully executed, the parties could "request that the court re-set the matter for trial." (JAE 15). The *DeSoto* action was officially dismissed as of November 15, 2021. (JAF 119).

## B. Procedural Background

Plaintiff initiated this action on January 30, 2023, in Los Angeles County Superior Court. (ECF No. 1-1). On February 22, 2023, Defendant removed the action to this Court. (ECF No. 1). On May 17, 2023, Plaintiff filed the operative First Amended Complaint ("FAC"). (ECF No. 32). Defendant filed an answer on August 8, 2023. (ECF No. 37).

---

[4] The Court hereby grants the applications to file under seal in connection with this motion. (ECF Nos. 55, 61).

1   Following the filing of the Answer, on August 15, 2023, Defendant filed a Motion for
2   Judgment on the Pleadings, which the Court granted in part.  (ECF Nos. 38, 50).  Defendant
3   now moves for summary judgment as to all of Plaintiff's remaining claims, while Plaintiff
4   opposes and cross-moves for partial summary judgment.  (ECF No. 62).  Defendant also
5   timely filed a reply in support of its motion.  (ECF No. 64).

6   **II.   LEGAL STANDARD**

7          Summary judgment is appropriate when the moving party demonstrates there is no
8   genuine dispute as to any material fact and the moving party is entitled to judgment as a
9   matter of law.  Fed. R. Civ. P. 56(a).  The "mere existence of some alleged factual dispute
10  between the parties will not defeat an otherwise properly supported motion for summary
11  judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v.*
12  *Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A fact is "material" if the substantive
13  law identifies the fact as critical such that the resolution of the fact under governing law
14  might affect the outcome of the case, and a dispute about a material fact is "genuine" if
15  "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."
16  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987).

17         "[T]o carry its burden of production, the moving party must produce either evidence
18  negating an essential element of the nonmoving party's claim or defense or show that the
19  nonmoving party does not have enough evidence of an essential element to carry its
20  ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210
21  F.3d 1099, 1102 (9th Cir. 2000) (citing *High Tech Gays v. Defense Indus. Sec. Clearance*
22  *Office*, 895 F.2d 563, 574 (9th Cir. 1990)).  If the moving party satisfies its initial burden,
23  the burden then shifts to the opposing party, who "must set forth specific facts showing
24  that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 256.  A genuine issue requires
25  evidence, not speculation or guesswork.  *Guidroz-Brault v. Mo. Pac. R.R. Co.*, 254 F.3d
26  825, 829 (9th Cir. 2001).  The opposing party may not simply rely upon the allegations or
27  denials in its pleadings.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 321 n.3 (1986).  Nor
28  can it rely on testimony that is conclusory, speculative, or "uncorroborated and self-

serving" to raise genuine issues of fact and defeat summary judgment. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (citations and internal quotations omitted). Instead, the opposing party, by citing to documents, depositions, declarations, admissions, interrogatory answers, or other material, must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 252. "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Anderson*, 477 U.S. at 252).

In resolving a summary judgment motion, the court does not weigh the evidence, determine the truth, or make credibility determinations. *See Anderson*, 477 U.S. at 255. The court construes the evidence and draws reasonable inferences in the light most favorable to the opposing party. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted). Thus, summary judgment for the moving party is proper when a "rational trier of fact" would not be able to find for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.   DISCUSSION

Defendant moves for summary judgment as to all of Plaintiff's remaining claims. Specifically, Defendant argues that it had no duty to defend the underlying *DeSoto* action because: (1) it was a related claim to an earlier action and therefore there was no possibility of coverage; (2) various policy exclusions barred any possibility of coverage; and (3) any claim under the 2018/2019 policy was inapplicable due to the timing of the *DeSoto* action.[5] Defendant also argues that it is entitled to summary judgment on Plaintiff's bad faith claim because: (1) there was no breach of the insurance policy; (2) any claims handling was reasonable; (3) any bad faith claim was untimely; and (4) the bad faith claim is improperly

---

[5] Both parties agree that Plaintiff's first cause of action for breach of the 2018/2019 policy should be dismissed. Therefore, the Court will grant Defendant's motion as to the first breach of contract cause of action based on the 2018/2019 policy.

based on UIPA violations.   Finally, Defendant argues that it is entitled to summary judgment on Plaintiff's UCL claim because it is improperly based on UIPA violations and because Plaintiff has an adequate remedy at law.   Plaintiff opposes Defendant's motion for summary judgment, and cross-moves as to breach of contract based on failure to defend under the 2017/2018 policy.   The Court will examine each argument in turn.

### A.   Plaintiff's Breach of Contract Claim

Plaintiff brings a breach of contract claim under the 2017/2018 Policy, alleging that Defendant breached its duty to defend Plaintiff in the *DeSoto* Action pursuant to the Policy. Defendant argues that it is entitled to summary judgment on this claim because there was no possibility of coverage of the *DeSoto* Action and, therefore, no duty to defend.   The Court begins its analysis with the framework set by California law governing the duty to defend and the interpretation of insurance contracts, before turning to each party's specific contentions.[6]

### 1.   Duty to Defend Generally

California law generally imposes "a very broad duty to defend its insured." *Anthem Electronics, Inc. v. Pacific Employers Ins. Co.*, 302 F.3d 1049, 1054 (9th Cir. 2002).   This duty to defend arises "if the underlying complaint alleges the insured's liability for damages potentially covered under the policy, or if the complaint might be amended to give rise to a liability that would be covered under the policy." *Montrose Chem. Corp. v. Super. Ct.*, 6 Cal. 4th 287, 299 (1993).   Both an insurer and an insured may move for summary judgment regarding the duty to defend, but they are not subject to the same burden of proof. *See id.* at 300.   Instead, "[o]nce the insured has established potential liability by reference to the factual allegations of the complaint, the terms of the policy, and any extrinsic evidence upon which the insured intends to rely, the insurer must assume its duty to defend unless and until it can conclusively refute that potential." *Id.* at 295–96.

---

[6] The Court sits in diversity jurisdiction and therefore applies California substantive law. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

"Any doubt as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor." *Id.* at 299–300.

To determine whether a duty to defend exists, courts generally begin by "comparing the allegations of the complaint [in the underlying action] with the terms of the policy." *Id.* at 295. However, courts may also look to facts extrinsic to the complaint to determine whether "they reveal a possibility that the claim may be covered by the policy." *Anthem Electronics*, 302 F.3d at 1054. Even if the exact language of the pleadings in the complaint falls outside the policy coverage, the duty to defend still exists if the plaintiff could fairly and reasonably amend the complaint to state a covered liability claim. *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal. 4th 643, 654 (2005). Because this process necessarily involves interpretation of policy language, it becomes a question of "settled rules of contract interpretation." *State v. Continental Ins. Co.*, 55 Cal. 4th 186, 195 (2012).

Finally, breach of contract claims may be based on a violation of the duty to defend. "Breach of an insurer's duty to defend violates a contractual obligation." *Amato v. Mercury Cas. Co.*, 53 Cal. App. 4th 825, 831 (1997). Therefore, when a duty to defend is triggered, a complete and full defense must be provided to the insured. *See Risely v. Interinsurance Exch. Of the Auto. Club*, 183 Cal. App. 4th 196, 210 (2010).

2.    Interpretation of Insurance Contracts

The goal of all contract interpretation "is to give effect to the mutual intention of the parties." *Bank of the West v. Super. Ct.*, 2 Cal. 4th 1254, 1264 (1992). This mutual intention may be inferred from the written provisions of a contract. *AIU Ins. v. Super. Ct.*, 51 Cal. 3d 807, 822 (1990). Therefore, if "contractual language is clear and explicit, it governs." *Bank of the West*, 2 Cal 4th at 1264. If, however, the language of the contract is ambiguous, the court should interpret the terms in accordance with the insured's "objectively reasonable expectations." *Id.*; *see also* Cal. Civ. Code § 1649 (where contract's language is ambiguous "it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it."). Furthermore, California courts "generally resolve ambiguities in favor of coverage." *AIU*, 51 Cal. 3d at

822.   When construing the terms of an insurance policy, "[i]t is the burden of the insured to bring the claim within the basic scope of coverage, and the burden of [the insurer] to prove exclusions to the coverage."  *Golden Eagle Ins. Corp. v. Cen-Fed, Ltd.*, 148 Cal. App. 4th 976, 984 (2007) (internal citations omitted).   Additionally, when interpreting insurance policies, courts apply different standards of interpretation to coverage and exclusionary clauses.   Courts must interpret coverage clauses "broadly so as to afford the greatest possible protection to the insured," while they must interpret "exclusionary clauses . . . narrowly against the insurer."  *State Farm Mut. Auto. Ins. Co. v. Partridge*, 10 Cal. 3d 94, 101–02 (1973).

> 3.   Whether the *DeSoto* Action was Related to the *Foreman* Action

Here, as previewed above, the first dispute over contract interpretation and Defendant's alleged duty to defend deals with the 2017/2018 Policy's definition of "Related Claims."  Defendant maintains that there was no possibility of coverage over the *DeSoto* Action because it was "Related" to the 2014 *Foreman* Action and, therefore, under the policy, predated the 2017/2018 Policy's coverage.  Plaintiff opposes, arguing that the *DeSoto* Action and the *Foreman* Action are not "Related Claims" under the policy.  The Court agrees with Plaintiff.

In making this decision, the Court looks first to the policy language, and the limitations on coverage for "Related Claims" specifically.  While both parties appear to agree that the allegations in *DeSoto* qualify as a "Medical Incident" under the policy, they disagree as to when the *DeSoto* claim accrued.  Specifically, Defendant argues that, under the policy, because *DeSoto* was a "Related Claim" to the 2014 *Foreman* Action, it should be treated as having been made in 2014, prior to any coverage under the 2017/2018 policy. It is true that the policy states that "[a]ll Related Claims will be treated as a single Claim made when the earliest of such "Related Claims" was first made. . . ."  (JAE 2 at 25).  It is also true that the policy broadly construes when "Related Claims" should be treated as a single claim.  For instance, the policy states that related claims should be deemed a single claim whenever they are made and no matter whether they are numerous, whether they

1   involve different claimants, or different insureds, or whether they were made in a class

2   action. (JAE 2 at 25). The policy even states that "Related Claims" should be treated as a

3   single claim even if they were made in different policy periods. (JAE 2 at 25). Therefore,

4   if the *Foreman* Action and the *DeSoto* Action qualify as "Related Claims," it appears likely

5   that they should be deemed a single claim under the policy's broad language. However,

6   the definition of "Related Claims" is narrower, and does not allow for such a result here.

7        The Policy defines "Related Claims" as "two or more Claims arising out of a single

8   act, error or omission that are logically or causally connected by any common fact,

9   circumstance, situation, transaction, event, advice or decision." (JAE 2 at 32). This

10   definition is not ambiguous, and therefore its clear and explicit meaning should govern.[7]

11   *See Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.*, 5 Cal. 4th 854, 867

12   (1993). When examining the definition, it appears to contain two clauses: first it requires

13   the two or more Claims to arise out of a "single act, error or omission"; and second it states

14   that the two claims must be "logically or causally connected by any common fact,

15   circumstance, situation, transaction, event, advice or decision." The Court begins by

16   examining the plain meaning of the first clause.

17        In the insurance context, "arising out of" has been interpreted broadly. *See Medill*

18   *v. Westport Ins. Corp.*, 143 Cal.App.4th 819, 830 (2006) (finding it is "settled" that "arising

19   out of," when used in insurance contracts, "does not import any particular standard of

20   causation or theory of liability.... Rather, it broadly links a factual situation with the event

21   creating liability, and connotes only a minimal causal connection or incidental

22   relationship"); *see also Los Angeles Lakers, Inc. v. Federal Insurance Co.*, 869 F.3d 795,

23   801 (9th Cir. 2017) ("we must acknowledge how broad this exclusionary clause is.

24   California courts and our court have consistently given broad interpretation to the clause

25   'arising from' in an insurance contract."). Therefore, the policy language makes clear that

26   the two claims need not have a tight causal nexus to whatever "single act, error or

27

28   [7] Indeed, neither party appears to argue that it is ambiguous, though they argue for opposing interpretations.

omission" they are linked.  However, the policy language also makes clear that they must both be linked to a "single" act, error or omission.

The term single is not ambiguous as used in this context, and serves to limit the scope of what may be "related" under this policy.  Instead, the plain meaning of "single" as "consisting of only one in number" should be applied.  *See Single*, Merriam-Webster, https://www.merriam-webster.com/dictionary/single (last accessed December 20, 2023) (defining single as "consisting of only one in number").  Therefore, by defining related claims as those claims arising out of one act, error, or omission, as opposed to a series of acts, errors, or omissions, the policy drafters created a clear limit on what may be considered "related."  This intention to limit what qualifies as "Related Claims" appears particularly true when examined in contrast to similar clauses that have come before the courts.  For instance, in *XL Specialty Ins. Co. v. Perry*, the court examined whether two claims qualified as "Interrelated Wrongful Acts" under policy language defining such related acts as "wrongful acts which have as a common nexus any fact, circumstance, situation, event transaction or series of facts, circumstances, situations, events or transactions."  *XL Specialty Ins. Co. v. Perry*, No. CV 11-02078-RGK (JCGx), 2012 WL 3095331, at *5 (C.D. Cal. Jun. 27, 2012).  The Court found that the definition was unambiguous and "describe[d] a broad range of relationships between the original claim and other lawsuits that will be deemed as part of that same claim and made at the time of the first claim."  *Id.* at 6.  Similarly, in *WFS Financial, Inc. v. Progressive Cas. Ins. Co., Inc.*, the Ninth Circuit affirmed a district court's finding that two suits qualified as "Interrelated Wrongful Acts" under policy language defining such acts as "having as a common nexus any fact, circumstance, situation, event, transaction or series of related facts, circumstances, situations, events or transactions."  232 F. App'x 624, 625 (9th Cir. Apr. 16, 2007).  In contrast, the 2017/2018 Policy nowhere references relation to a series of acts, and instead allows for relation only where the two claims have some loose causal nexus to one, single, "act, error or omission."  With this limiting language in mind, the

1  Court turns to the parties' contentions regarding the relationship between the *DeSoto* and
2  *Foreman* Actions.

3       Defendant argues that the decision to understaff the Oxnard Manor facility, which is
4  alleged in both the *DeSoto* and *Foreman* Action, should be considered the single act linking
5  the two actions. However, this ignores the temporal distance between the two actions and,
6  therefore, the allegations of acts underlying them. *Foreman* alleged that in 2014 Plaintiff,
7  and numerous other skilled nursing facilities, deliberately chose to understaff facilities to
8  maximize profits. *DeSoto* alleges that one of, but not the only possible, cause of DeSoto's
9  injury and death was a decision sometime prior to her 2017 death to understaff the Oxnard
10 Manor facility. With these facts in mind, Defendant appears to ask the Court to assume
11 that Plaintiff made no new staffing decisions between 2014 and 2017, such that one
12 "single" act, one decision to understaff in 2014, lead to both actions.[8] While it is true that
13 the policy states that actions may be related even if they arise at different times, they must
14 still relate to a single act, which Defendant has not shown here.

15      The second clause of the definition of "related claims," while broad, does not negate
16 this result. The Court agrees with Defendant that the language "logically or causally
17 connected by any common fact, circumstance, situation, transaction, event, advice or
18 decision" is broad in its scope. However, the clause appears to incorporate the standard
19 for relatedness set forth by the California Supreme Court in *Bay Cities* into the policy
20 language itself. Therefore, it is useful to briefly examine that seminal case, and its
21 interpretation of the breadth of a "related" claims provision.

22      In *Bay Cities*, the court found that the term "related" should be understood to
23 "encompass[] both logical and causal connections." 5 Cal. 4th at 873. However, the court
24 also cautioned that "related" should not be understood to encompass "every conceivable
25 logical relationship." *Id.* Instead, where a relationship between two claims, while logical,

26
27 [8] During oral argument, Defendant articulated a new theory, that the single act or decision
28 was a long-lasting "scheme" to understaff and increase profits. However, this too asks the
   Court to stretch the meaning of "single" under the policy.

is "so attenuated or unusual that an objectively reasonable insured could not have expected they would be treated as a single claim under the policy," the two claims should not be "related." *Id.*

While the court in *Bay Cities* was tasked with interpreting "related" in the context of a policy which left that term undefined, the reasoning appears apt in the instant action. To find *DeSoto* and *Foreman* related, even looking only to the broad second clause, could approach the kind of attenuation the California Supreme Court was concerned with in *Bay Cities*. The attenuation becomes all the more stark when considering the definition as a whole. Unlike in *Bay Cities*, the Court here is presented with a specifically defined term: "Related Claims." The Court must interpret the definition of "Related Claims" to give meaning to all of its clauses. Therefore, while the allegations in *DeSoto* and *Foreman* may be logically connected, in that both allege, at least in part, that Plaintiff understaffed its facilities, the connection stops there. *DeSoto* arose out of a specific incident in which employees at Plaintiff's facility allegedly failed to properly handle DeSoto while treating her, resulting in a fall and life-ending injuries. This is insufficient under the relatively narrow definition of "Related Claims" under the policy.[9] Therefore, given the plain meaning of the policy language, relevant case law, and the allegations of the underlying actions here, the Court finds that the *DeSoto* and *Foreman* Actions were not "Related Claims" under the 2017/2018 policy and the Court will not consider the claim in *DeSoto* as having been first made in 2014.

---

[9] Furthermore, the logical extension of Defendant's argument also supports the understanding that *DeSoto* and *Foreman* are unrelated under the policy. Under Defendant's proffered definition, any future action in which a resident at one of Plaintiff's facilities was injured and alleged, at least in part, that the facility was intentionally understaffed, would be related back to the *Foreman* Action. This would appear to undermine the purpose of Plaintiff's choice to take out a liability policy with Defendant, and thus seems unlikely to represent the intention of the parties in contracting.

4. Applicability of Policy Exclusions

Defendant next argues that there was no possibility of coverage that could have created a duty to defend in *DeSoto* because a number of policy exclusions wholly barred coverage. Plaintiff disputes the applicability of such exclusions to the entirety of the *DeSoto* Action and the Court agrees.

When examining the applicability of policy exclusions and the duty to defend, courts must be mindful that the duty to defend arises when the comparison of the policy language, the allegations of the underlying action's complaint, and any extrinsic evidence demonstrates that a mere possibility of coverage existed, even if the underlying plaintiff would have needed to amend their complaint to clearly come within coverage. *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal. 4th 643, 654 (2005). The duty to defend, therefore, is broad. Through this lens, the Court will examine each of the exclusions upon which Defendants rely.

*i. Exclusion 1*

The first exclusion under the 2017/2018 policy bars coverage for any claim "that is or is alleged to be based upon, arising out of, directly or indirectly resulting from, or in consequence of: any Claim arising from [a]. . . Medical Incident . . . that has resulted in a claim prior to the Policy Period. . ." (JAE 2 at 33). Defendant argues that, because *Foreman* and *DeSoto* made the same and substantially similar allegations, *DeSoto* was a claim arising out of *Foreman* and, therefore, a claim occurred prior to the policy period. This argument is similar to the argument Defendant makes with regard to "Related Claims" above. However, it too asks the Court, improperly, to strain its contract interpretation in favor of the insurer and against the insured. "Medical Incident" is defined in the 2017/2018 policy as: 1) "[a]n actual or alleged act, error or omission in the course of rendering Administrative Services or Healthcare Services; [and] (2) [a]n actual or alleged violation by an Insured of any Rights of Residents." At the very least, *DeSoto* alleged a "Medical Incident" wholly separate and apart from any "Medical Incidents" alleged in *Foreman*. The *DeSoto* Action alleged that employees of Plaintiff took poor care of DeSoto, which led to her fall and, ultimately, her death. While the *DeSoto* complaint also alleged

-16-

intentional understaffing, similar to the complaint in *Foreman*, this was not the entirety of the *DeSoto* plaintiff's action.  Courts must interpret "exclusionary clauses . . . narrowly against the insurer."  *Partridge*, 10 Cal. 3d at 101–02.  Yet, Defendant asks the Court to apply the exclusion clause expansively.  The Court declines to do so and finds that Plaintiff has established a possibility of coverage existed, despite exclusion one.

### ii.  Exclusion 4

Defendant next argues that the fourth exclusion under the policy barred any possibility of coverage in the *DeSoto* Action.  Exclusion four excludes coverage for any claim "that is or is alleged to be based upon, arising out of, directly or indirectly resulting from, or in consequence of: . . . bodily injury . . . or any other type of harm, damage, loss, expected or intended from the standpoint of any Insured, or arising from the performance by any Insured of any intentional or willful act, other than those acts made in good faith in the furnishing of Healthcare Services."  (JAE 2 at 33).  While Defendant is correct that the *DeSoto* complaint included allegations of knowing and intentional conduct on the part of Plaintiff, it also included allegations of negligence in the third cause of action for wrongful death.  (JAE 10 at ¶¶ 74–79).  Defendant asks the Court to ignore these allegations and construe the gravamen of the *DeSoto* Complaint as alleging uncovered intentional conduct.  However, this again misapplies the standard for the duty to defend, which asks only whether some possibility of coverage existed.  Because the *DeSoto* complaint alleged negligent conduct, in addition to intentional conduct, a possibility of coverage did exist, and Defendant may not rely on Exclusion 4 to argue that it did not have a duty to defend.

### iii.  Exclusion 5

Finally, Defendant argues that the fifth exclusion under the 2017/2018 Policy barred any possibility of coverage in the *DeSoto* Action.  The fifth exclusion bars coverage for any claim "that is or is alleged to be based upon, arising out of, directly or indirectly resulting from, or in consequence of: . . . any willful, dishonest, fraudulent, criminal or intentionally malicious act, error or omission by an Insured; any willful violation of law, statute, rule or regulation by an Insured; or the gaining of any profit, remuneration or

advantage by an Insured to which such insured was not legally entitled; including but not limited to healthcare fraud." (JAE 2 at 33). As above regarding the fourth exclusion, the applicability of the fifth exclusion to some of the allegations in the *DeSoto* complaint does not mean the exclusion allows Defendant to escape its duty to defend where other allegations do not appear to fall within the exclusion. As already explained, the *DeSoto* complaint contained allegations of negligence in addition to willful conduct, and therefore, a possibility of coverage existed.

Overall then, Defendant has not met its burden to demonstrate that there was no possibility of coverage when the tender of the *DeSoto* Action was made. Therefore, the Court denies Defendant's motion for summary judgment on the breach of contract claim under the 2017/2018 Policy. However, the Court finds that Plaintiff has met its burden to demonstrate that a possibility of coverage over the *DeSoto* Action existed and that, therefore, Defendant breached its duty to defend, thereby breaching its contract. The Court GRANTS Plaintiff's cross-motion as to the 2017/2018 Policy breach of contract claim.

### B. Plaintiff's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

Every insurance policy contract contains an implied covenant of good faith and fair dealing that "neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Gruenenberg v. Aetna Ins. Co.*, 9 Cal. 3d 566, 573 (1973). Therefore, to demonstrate an insurer breached this covenant, a plaintiff must first demonstrate that the insurer breached its obligations under the contract. *See California State Auto. Assn. Inter-Ins. Bureau v. Super. Ct.*, 184 Cal. App. 3d 1428, 1434 (1986) (before proceeding to adjudicate bad faith, it must first be established that the insurer breached its obligations under insurance policy). However, a breach of contract alone does not determine bad faith. Instead, to prevail at trial on a bad faith claim, the insured must also show that the insurer withheld a benefit under the policy unreasonably or without proper cause. *Congleton v. National Union Fire Ins. Co.*, 189 Cal. App. 3d 51, 58–59 (1987). Breach of a duty to defend can give rise to a bad faith claim, where such a breach

1   was unreasonable. *Campbell v. Super. Ct.*, 44 Cal. App. 4th 1308, 1319 (1996). "[T]he
2   reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact,"
3   and it may only be decided as a question of law "where the evidence is undisputed and only
4   one reasonable inference can be drawn from the evidence." *Chateau Chamberay*
5   *Homeowners Ass'n. v. Associated Internat. Ins. Co.*, 90 Cal. App. 4th 335, 346 (2001).

6       Here, Defendant argues that it is entitled to summary judgment on Plaintiff's claim
7   for breach of the implied covenant of good faith and fair dealing. Defendant bases this
8   argument on its perceived lack of any breach of the duty to defend, the reasonableness of
9   its claims handling practices, the alleged untimeliness of the claim, and alleged improper
10  bases for the claim. Plaintiff opposes, but does not cross-move as to bad faith. The Court
11  will address each of Defendant's arguments in turn.

12              1.   Breach of Contract
13      Defendant first argues that, because there was no breach of contract, therefore there
14  can be no breach of the duty of good faith and fair dealing. However, this argument is
15  foreclosed by the Court's finding above that Defendant breached its duty to defend and
16  therefore breached its contract with Plaintiff.

17              2.   Reasonableness of Claims Handling
18      Defendant argues in the alternative that the Court should find, as a matter of law,
19  that Defendant's interpretation of the policy language and its exclusions was "reasonable"
20  as applied to the *DeSoto* Action. The reasonableness of an insurer's claims-handling
21  conduct is ordinarily a question of fact. *Chateau Chamberay*, 90 Cal. 4th at 346
22  (citing *Paulfrey v. Blue Chip Stamps*, 150 Cal. App. 3d 187, 198 (1983)). However, it
23  becomes a question of law where the evidence is undisputed and only one reasonable
24  inference can be drawn from the evidence. *Id.* "While an insurer's conduct need not rise
25  to the level of actual dishonesty, fraud, or concealment to constitute bad faith, an insurer's
26  conduct must nevertheless be prompted not by an honest mistake, bad judgment or
27  negligence but rather by a conscious and deliberate act." *McDaniel v. Gov't Emps. Ins.*
28

*Co.*, 681 F. App'x 614, 615–16 (9th Cir. 2017) (internal citations and quotation marks omitted).

Here, the Court is not persuaded that Defendant has met its burden to establish that the Court may find reasonableness as a matter of law. Defendant argues that its analysis of Plaintiff's claim was reasonable, at least in part due to a large number of complaints against management of Plaintiff's facility it discovered during its investigation. (Mot. at 55–56). However, the evidence presented to the Court does not make Defendant's claims investigation process clear. There are a number of factual disputes about what Defendant considered when reaching its decision to deny coverage and any defense of *DeSoto*, to include the role played by coverage counsel, the withdrawal of Lewis Brisbois as defense counsel, and any internal notes regarding how the decisions were reached, many of which are redacted as produced to the Court. Therefore, the Court is not persuaded that no reasonable juror could find the claims handling was unreasonable.

### 3.    Timeliness of the Bad Faith Claim

Defendant next argues that the bad faith claim is untimely brought, which is largely a reprise of its argument in the Motion for Judgment on the Pleadings already decided by this Court. The Court therefore finds that this portion of Defendant's argument is in essence a motion for reconsideration of the Court's prior order. Defendant again asks the Court to find that the statute of limitations over the bad faith claim began to run upon signing of the settlement agreement in *DeSoto*, rather than upon dismissal of the case. However, because Defendant has provided no basis for reconsideration or otherwise demonstrated that such ruling was in error, the Court declines to reconsider its prior decision.

### 4.    Basis for the Bad Faith Claim

Finally, Defendant argues that the bad faith claim is improperly based on insurance regulations which do not give rise to a private right of action. Plaintiff objects that Defendant has asked the Court to rule on a further motion for judgment on the pleadings. However, even if Defendant had made this argument in a motion for judgment on the

pleadings, the argument would have failed.  While it is true that the FAC pleads additional violations of the insurance code, this is not the sole basis for the bad faith claim.  Instead, the bad faith claim alleges that Defendant acted unreasonably in its handling of the *DeSoto* claim, which, on its own is a basis for a bad faith claim.  *See L.A. Lakers*, 869 F.3d at 812.

Therefore, overall, Defendant has failed to meet its burden to demonstrate that it is entitled to summary judgment on Plaintiff's claim for breach of the implied covenant of good faith and fair dealing.[10]  The Court DENIES Defendant's motion for summary judgment as to the bad faith claim.

## C.  Plaintiff's UCL Claim

Defendant challenges Plaintiff's final cause of action under the UCL, arguing that it is improperly based on UIPA violations, and that Plaintiff has an adequate remedy at law. Plaintiff opposes each argument.  The Court will examine each in turn.

### 1.   UCL Claims May Not be Based on UIPA Violations

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.  A plaintiff may bring an action for violation of the UCL based on any of these three prongs: unlawful, unfair, or fraudulent business acts or practices.  *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007).  "An action under the UCL's unlawful prong borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1145 (9th Cir. 2012) (internal citations omitted).  Where a plaintiff cannot state a claim under a "borrowed" law, he or she cannot state an "unlawful" UCL claim.  *See, e.g., Ingels v. Westwood One Broad Servs., Inc.*, 129 Cal. App. 4th 1050, 1060 (2005) ("A defendant cannot be liable under § 17200 for

---

[10] Defendant also argues that it is entitled to summary judgment on Plaintiff's claim for punitive damages because it is entitled to summary judgment on the bad faith claim. However, because the Court finds summary judgment is inappropriate as to the bad faith claim, the Court likewise denies Defendant's request for summary judgment as to the punitive damages claim.

committing 'unlawful business practices' without having violated another law."); *Precise Aerospace Mfg., Inc. v. MAG Aerospace Indus., LLC*, No. 2:17-cv-01239-RGK-AJW, 2018 WL 3390151, at \*8 (C.D. Cal. Feb. 16, 2018). The California Supreme Court has held that "[p]rivate UIPA actions are absolutely barred." *Zhang v. Super. Ct.*, 57 Cal. 4th 364, 384 (2013); *see also Moradi-Shalal v. Fireman's Fund Ins. Companies*, 46 Cal. 3d 287, 304 (1988) (holding that section 790.03 was not intended "to create a private civil cause of action against an insurer that commits one of the various acts listed in section 790.03, subdivision (h)"). In light of this ban on private rights of action under the UIPA, private plaintiffs are likewise barred from bringing UCL claims based solely on violations of the UIPA. *Zhang*, 57 Cal. 4th at 384 ("a litigant may not rely on the proscriptions of section 790.03 as the basis for a UCL claim").

Here, Plaintiff does allege that the UCL claim is based, at least in part on a violation of the UIPA. Under settled California law, Plaintiff may not base its UCL claim on UIPA violations. However, in the insurance context, breach of the implied covenant of good faith and fair dealing has repeatedly been found to sustain the "unlawfulness" prong of a UCL claim. *See, e.g.*, *Yadidsion v. AmGUARD Ins. Co.*, No. 2:22-CV-01038-AB-PVC, 2022 WL 2288307, at \*5 (C.D. Cal. Apr. 11, 2022) ("a claim for breach of the implied covenant may support a UCL claim"); *Khamis v. Trumbull Ins. Co.*, No. SACV 21-735 JVS (DFMx), 2021 WL 4497890, at \*3 (C.D. Cal. June 16, 2021) (finding that allegations of insurer's bad faith claims handling "constitute the sort of conduct that comes within the reach of UCL"); *Nestle USA, Inc. v. Crest Foods, Inc.*, No. LA CV16-07519 JAK (AFMx), 2019 WL 2619635, at \*10 (C.D. Cal. Mar. 8, 2019) ("Although claims based on an alleged breach of contract generally do not fall within the 'unlawful' theory of the UCL, allegations as to tortious conduct related to contractual relationships may be within its scope."); *Bikram's Yoga Coll. of India v. Phila. Indem. Ins. Co.*, No. CV 14–5228–GHK (JCx), 2014 WL 12607689, at \*2 (C.D. Cal. Aug. 26, 2014) (finding allegations that insurer acted in bad faith sufficient to state a UCL claim despite plaintiffs also alleging that the insurer violated the UIPA); *Zhang*, 57 Cal. 4th at 380 ("[B]ad faith insurance practices may qualify

as any of the three statutory forms of unfair competition."). Therefore, where, as here, plaintiff has also based its UCL action on the alleged breach of the duty of good faith and fair dealing, the UCL claim will not be dismissed because of allegations of UIPA violations.

### 2.   Adequacy of Plaintiff's Remedy

Remedies available to private plaintiffs under the UCL "are generally limited to injunctive relief and restitution." Zhang, 57 Cal. 4th at 371 (internal citation omitted). "In the insurance context, allegations that are essential to plead a claim for violation of the UCL are: (1) plaintiff's status as an insured or intended beneficiary of the insurance policy, (2) the existence of the policy, (3) the insurer's conduct and that such conduct was an unfair, unlawful or fraudulent business practice in violation of Bus. & Prof. Code § 17200, (4) plaintiff has no adequate remedy at law, (5) a request for injunctive relief and or restitution (monetary damages are not recoverable under the UCL), and (6) a request for attorney's fees." Bentley v. United of Omaha Life Ins. Co., No. CV 15-7870-DMG (AJWx), 2016 WL 7443189, at *6 (C.D. Cal. June 22, 2016) (citing Heighley v. J.C. Penney Life Ins. Co., 257 F. Supp. 2d 1241, 1259 (C.D. Cal. 2003)).

In general, an adequate legal remedy precludes a party from seeking equitable relief. Morales v. Trans World Airlines, Inc., 504 U.S. 374, 381 (1992) ("It is a basic doctrine of equity jurisprudence that courts of equity should not act when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief.") (internal quotation marks and alterations omitted). Accordingly, because a claim brought under the UCL is equitable in nature, damages may not be recovered. Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1144 (2003). Courts have expressly found that the payment of policy benefits are "damages" and therefore not recoverable under the UCL. See Bentley, 2016 WL 7443189, at *6 (C.D. Cal. June 22, 2016) (collecting cases and dismissing plaintiff's UCL claim for restitution based on an alleged violation of the insurance statutes at issue because the claim was based upon withheld policy benefits and was encompassed by breach of contract claim seeking proceeds under the policy).

Defendant argues that Plaintiff may not seek a UCL claim in this action because it has an adequate remedy at law. Plaintiff narrowly opposes, arguing that its UCL claim is pled as an alternative basis for relief if it is determined that it does not have any other adequate remedy at law. In light of the Court's finding as to Defendant's breach of contract, and the Court's concerns that Plaintiff's claims are largely duplicative of the breach of contract claim, the Court finds that Plaintiff possesses an adequate remedy at law and will GRANT summary judgment as to the UCL claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court hereby GRANTS Summary Judgment in part as follows:

1.    Defendant's request for summary judgment as to Plaintiff's breach of contract claim under the 2018/2019 Policy is GRANTED;

2.    Defendant's request for summary judgment as to Plaintiff's breach of contract claim under the 2017/2018 Policy is DENIED;

3.    Plaintiff's cross-motion for summary judgment as to Plaintiff's breach of contract claim under the 2017/2018 Policy is GRANTED;

4.    Defendant's request for partial summary judgment as to Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is DENIED;

5.    Defendant's request for partial summary judgment as to Plaintiff's claim under the UCL is GRANTED.

Dated: December 21, 2023

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE