WILLIAM C. MORISON (No. 99981)
wcm@morison.law
JOANNE M. WENDELL (No. 191785)
jmw@morison.law
MORISON LAW, LLP
3478 Buskirk Avenue, Suite 342
Walnut Creek, CA  94523
Telephone: (925) 937-9990
Facsimile: (925) 937-3272

Attorneys for Defendant
HALLMARK SPECIALTY
INSURANCE COMPANY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| OXNARD MANOR LP dba OXNARD MANOR HEALTH CENTER, a California Limited Partnership,<br><br>Plaintiff,<br><br>vs.<br><br>HALLMARK SPECIALTY INSURANCE COMPANY, an Oklahoma Corporation,<br><br>Defendant. | No. 2:23-cv-01322-SPG-MAR<br><br>Honorable Sherilyn Peace Garnett<br><br>DECLARATION OF JOANNE M. WENDELL IN SUPPORT OF DEFENDANT'S MOTION *IN LIMINE* NO. 2 TO PRECLUDE ALL ARGUMENT, TESTIMONY, MENTION, AND EVIDENCE BY AND REGARDING PLAINTIFF'S "30(b)(6)" WITNESS BARRY KAYE<br><br>[Filed concurrently with Motion *in Limine* 2]<br><br>Date:      April 10, 2024<br>Time:      3:00 PM<br>Location:  Courtroom 5C<br>           First Street Courthouse<br>           350 West First St.<br>           Los Angeles, CA 90012<br><br>Trial Date:  April 30, 2024 |

- 1 -

MORISON LAW, LLP

Wendell Decl. ISO Def't's MIL No. 2 To Preclude All Argument, Testimony, Mention, And Evidence By And Regarding Plaintiff's "30(b)(6) Witness Barry Kaye

1      I, Joanne M. Wendell declare:

2      1.  I am an attorney with Morison Law, LLP, counsel to defendant Hallmark

3  Specialty Insurance Company ("Hallmark") in the above-entitled action.  I am

4  familiar with the file in this matter and make this declaration in support of

5  Hallmark's Motion *in Limine* No. 2 to Preclude All Argument, Testimony,

6  Mention, and Evidence By And Regarding Plaintiff's "30(b)(6)" Witness Barry

7  Kaye.

8      2.  Attached hereto as Exhibit A are  true and correct excerpts from the certified

9  deposition transcripts of Barry Kaye, Volumes I and II.

10     I declare under penalty of perjury under the laws of the United States of

11  America that the foregoing is true and correct and that this declaration was executed

12  in Pleasant Hill, California on March 13, 2024.

13

14                  /s/ Joanne M. Wendell

15                  Joanne M. Wendell

16

17

18

19

20

21

22

23

24

25

26

27

28

Morison
Law, LLP

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

OXNARD MANOR LP dba OXNARD      )
MANOR HEALTH CENTER, a          )
California Limited              )
Partnership,                    )
                                )  No. 2:23-cv-01322-
               Plaintiff,       )      SPG-MAR
                                )
       vs.                      )
                                )
HALLMARK SPECIALTY INSURANCE    )
COMPANY, an Oklahoma            )
Corporation, and DOES 1         )
through 100, inclusive,         )
                                )
               Defendants.      )
_____ )


CONFIDENTIAL
REMOTE VIDEO-RECORDED DEPOSITION OF
BARRY KAYE, PMK OF OXNARD MANOR LP dba OXNARD MANOR
HEALTH CENTER

_____

Tuesday, October 3, 2023


STENOGRAPHICALLY REPORTED BY:  JAIMIE PORTER, CSR
13751
JOB NO.:  1035780



Page 6

1              BE IT REMEMBERED that under the applicable

2      sections of the Code of Civil Procedure of the State

3      of California and Federal Rules of Court, on

4      Tuesday, the 3rd day of October, 2023, commencing at

5      the hour of 8:54 AM, before me, JAIMIE PORTER, a

6      Certified Shorthand Reporter in and for the State of

7      California, appeared via Zoom videoconference,

8      BARRY KAYE, PMK OF OXNARD MANOR LP dba OXNARD MANOR

9                     HEALTH CENTER,

10     Herein, called as a witness by the Defendant in the

11     above-entitled action, whom, per Code of Civil

12     Procedure Section 2025.320 and Federal Rules of

13     Court Rule 30, I placed under oath as the Certified

14     Shorthand Reporter by virtue of Code of Civil

15     Procedure Section 2093(b), to tell the truth, the

16     whole truth, and nothing but the truth, and who was

17     examined and testified as follows:

18              THE VIDEOGRAPHER:  We are now on the

19     record.  This begins Videotape No. 1 in the

20     deposition of Barry Kaye in the matter of Oxnard

21     Manor LP, et al., versus Hallmark Specialty

22     Insurance Company, et al., in the United States

23     District Court, Central District of California.

24              Today's Tuesday, October 3rd, 2023, and the

25     time is 8:54 AM.  This deposition is being taken at



Page 7

1    a remote location at the request of Morison and

2    Prough, LLP.

3                The videographer --

4                MS. WENDELL:  No, Mor- -- excuse me,

5    Morison Law, LLP.

6                THE VIDEOGRAPHER:  Okay.  The videographer

7    is Drew Bloksberg of Magna Legal Services.  The

8    court reporter is Jaimie Porter of Magna Legal

9    Services.

10               Will counsel and all parties present state

11   their appearances and whom they represent.

12               MS. WENDELL:  Good morning.  This is Joanne

13   Wendell.  I represent -- I'm with Morison Law, LLP,

14   and I represent Hallmark Specialty Insurance

15   Company.

16               MR. WAGNER:  Good morning.  This is Avi

17   Wagner for the plaintiff, Oxnard Manor, and the

18   witness, Mr. Barry Kaye.

19               THE VIDEOGRAPHER:  Will the court reporter

20   please swear in the witness.

21               (Whereupon, the witness was placed under

22               oath.)

23                      EXAMINATION

24      BY MS. WENDELL:

25      Q.   Good morning, Mr. Kaye.



Page 9

1     Q.    Are you appearing as an officer for Oxnard?

2     A.    No.

3     Q.    How are you appearing today?

4     A.    I'm a designee who's been designated to

5     testify on behalf -- as the PMK on behalf of Oxnard

6     today.

7     Q.    Okay.  And how are you the person most

8     knowledgeable for Oxnard?

9     A.    So as you might have seen from my email

10    address, I am an attorney.

11    Q.    Yes.

12    A.    And I've been apprised of these matters and

13    made myself aware of the -- of the topics that you

14    set forth in the deposition notice.  So that's --

15    that's how I'm qualified to answer your question.

16    Q.    Okay.  So you are -- and you do not --

17    you're not an officer or a director of Ox- -- not a

18    director, but you're not an officer of Oxnard?

19    A.    Correct.  I am not.

20    Q.    Are you an employee of Oxnard?

21    A.    No.

22    Q.    Are you a limited partner of Oxnard?

23    A.    No.

24    Q.    And you have never been either an officer,

25    employee, or limited partner of Oxnard?



Page 10

1      A.    That is correct.  I have never been.

2      Q.    When did you first become aware of this

3  litigation?

4      A.    Approximately six weeks ago.  Six,

5  seven weeks ago.

6      Q.    Have you spoken with anyone at Oxnard

7  regarding what is at issue in this litigation?

8      A.    I've spoken exclusively with counsel.

9      Q.    And which counsel would that be?

10     A.    Mr. Wagner.

11     Q.    Okay.  So you first became -- and I'll --

12  are you aware of an underlying action known as

13  DeSoto v Oxnard?

14     A.    Yes.

15     Q.    And how did you become aware of that?

16     A.    Again, through discussions with Mr. Wagner.

17     Q.    Okay.  And so you have no firsthand

18  knowledge of DeSoto?

19     A.    I've reviewed --

20           MR. WAGNER:  Ob- -- hold on -- sorry.  Hold

21  on a sec.  Object to the form.  Misstates his

22  testimony.

23           BY MS. WENDELL:

24     Q.    Do you have any firsthand knowledge of

25  DeSoto, and that would mean at the time that DeSoto



Page 14

1   can't -- I'm -- I'm giving you a general overview as

2   to -- in terms of being the designee for responding

3   to discovery.

4          Have there been occasions in some cases

5   when I've been the designee and responded to

6   discovery that I needed to reach out to someone at

7   the entity that I was responding on behalf of, yes,

8   but I can't tell you right now with absolute

9   certainty whether or not I did or didn't in anything

10  relation to Oxnard.

11      BY MS. WENDELL:

12      Q.   Okay.  Approximately how many times have

13  you spoken with Oxnard Manor or anyone at Oxnard

14  Manor?

15      A.   I don't recall -- I don't recall ever

16  speaking to anyone at the Oxnard Manor.

17      Q.   So your conversations would always be with

18  counsel or someone at counsel's office?

19      A.   Again, my -- my general way of handling

20  the -- and responding to discovery is out how I

21  outlined.

22          What I'm saying to you is that because of

23  the time frame, I can't specifically tell you -- I

24  can't specifically tell you which cases where I have

25  had to reach out to entities, the names of those



Page 15

1   entities.  I wish I had better recall, but I don't,

2   so ...

3        Q.    There -- there are quite a few, but --

4              So can you estimate how many times -- and

5   again, correct me if I'm -- if I'm misstating.  My

6   understanding is that you would verify discovery for

7   certain entities; is that correct?  That's your sole

8   relationship with these entities?

9        A.    Correct.  And to sit as a PMK if a

10  deposition was required.

11       Q.    And how many times, is your best estimate,

12  have you done that?

13       A.    The verification or the sitting as a PMK

14  for a -- for a deposition?

15       Q.    Both.

16       A.    I would probably say that I've verified 100

17  sets of discovery over the past few years, and I

18  would probably say I've sat 15, maybe 20 times

19  for -- as a deposition [sic], but I would say

20  probably on the 15 side of it.

21       Q.    As a PMK?

22       A.    Correct.

23       Q.    Were you a -- an officer, an employee, or a

24  partner or a director of any of those other

25  entities?



Page 16

```
 1      A.    No.
 2      Q.    Okay.  I kind of skipped over this.
 3            I'd like to go through some of the -- a few
 4   of the admonitions, and it's basically, you -- you
 5   are under oath, and it is under penalty of perjury.
 6            Is there any reason you can't give your
 7   best testimony today?
 8      A.    No.
 9      Q.    So far we're doing really good -- we are
10   doing very well.  We're not -- you know, we have to
11   do our best not to speak over one another.  It makes
12   it very difficult for the court reporter, which I'm
13   sure you know.
14            How many depositions have you given?
15      A.    Over the course of my career?
16      Q.    Sure.
17      A.    I think -- again, I'd say in terms of
18   actually sitting as the deponent, it's that number
19   that I alluded to before, 15 to 20, but probably
20   closer to 15.
21            If you're asking in terms of taking and
22   defending, over the course of my career, I'm going
23   to guess 25.
24      Q.    Okay.  And without telling me what was
25   said, have you had an opportunity to discuss your
```



Page 17

1    testimony with your attorney?

2         A.   Yes.

3         Q.   Okay.  And your attorney is Mr. Wagner?

4         A.   Yes.

5         Q.   Okay.  And did you receive the Notice of

6    Deposition and did you have an opportunity to review

7    it?

8         A.   Yes.

9         Q.   Yes, to both?

10        A.   Correct.

11        Q.   Did you review any documentation to prepare

12   for this deposition other than communications with

13   your counsel?

14        A.   Well, the documentation would have been in

15   addition to communication.  There were --

16        Q.   Correct.

17        A.   There were quite a bit of documents that

18   were -- that I -- that I looked over, so.

19        Q.   What documents did you look over?

20        A.   If I recall correctly, I think the

21   documents totaled -- they hit over 10,000 pages of

22   documents, in addition to today's set of exhibits.

23   I think there were -- production -- I mean, they all

24   had Bates stamps on them, so I assume they were

25   produced by one side or the other, but I believe it



Page 18

1    was in excess of 10,000 pages.

2        Q.   And would that have been Hallmark's

3    production?

4        A.   I would have to look to -- to see.  Again,

5    during the break, we could do that --

6        Q.   Okay.

7        A.   -- but I'm not sure if they were Hallmark

8    productions or Oxnard productions.

9        Q.   Okay.  I would like to know that.  I would

10   like to know that at the break.

11            Was there anything else that you

12   reviewed --

13       A.   No.

14       Q.   -- to --

15            And where did you receive these documents

16   from?

17       A.   From counsel.

18       Q.   And counsel would be Mr. Wagner?

19       A.   Yes.

20       Q.   Did you review anything other than

21   documents you received from Mr. Wagner?

22       A.   No.

23       Q.   Okay.  Sir, can you tell us what your

24   education is?

25       A.   I have a law degree --



Page 24

1    that's why I'm very careful.  I don't know -- I've

2    given -- I've provided testimony for perhaps or

3    verified documents for perhaps 10 to 20 entities --

4        Q.   That are connected -- that are connected

5    with Mr. Rechnitz?

6        A.   I -- I don't know the exact connection, but

7    there's entities that have connections to other

8    entities that he may have some interest in.

9        Q.   Okay.  Can you tell me all of the entities

10   that you've performed work for?

11       A.   I would --

12            (Simultaneous cross-talk.)

13   BY MS. WENDELL:

14       Q.   Okay.  Let me say this, have you -- have

15   you performed corporate work for Mr. Rechnitz?

16       A.   No.

17       Q.   Have you performed work other than what

18   you've already testified to for Oxnard Manor?

19       A.   No.

20       Q.   Have you performed work for Rock -- I think

21   it's Rockport Administrative Services, LLC?

22       A.   No.  Only what I've testified to earlier in

23   this deposition essentially acting as the -- the --

24   designee for --

25       Q.   Okay.



Page 25

1     A.    -- responding to discovery, for the

2  deponent sitting in the chair of the PMK.

3     Q.    And have you done so on behalf of Rockport?

4     A.    No.

5     Q.    Have you performed any work on behalf of

6  Brius, and that's B-R-I-U-S, LLC?

7     A.    Yes.  But there -- there were -- there were

8  a couple different variations of Brius entities, so,

9  I -- again, it's -- and along the way, some of the

10 names have changed, so it's -- it's hard for me to

11 state categorically, yes, but I know for sure that

12 I've signed verifications on behalf of entities that

13 have the word Brius in it.  But, again, there's

14 multiple entities.

15    Q.    There are.

16          And so at this point, as you sit here --

17 because two defendants in the underlying DeSoto

18 matter were Brius, LLC, and Brius Management

19 Company, Inc.

20    A.    Correct.

21    Q.    Those are the two.

22          So are -- are you able to say you performed

23 work for one or the other or just that you've

24 worked -- performed work for a Brius entity?

25    A.    I think I have, again, signed verifications

1  on behalf of both of those entities.

2      Q.   And is that the only work that you've done

3  for either Brius, LLC, or Brius Management Company,

4  Inc.?

5      A.   Correct.

6      Q.   Okay.  You've done no corporate work for

7  them?

8      A.   None.  No litigation.

9      Q.   Other than as a -- verifying the discovery?

10     A.   Correct, or sitting in the seat as a PMK.

11     Q.   PMK.  Okay.

12          Are you associated in any way with Brius,

13  LLC, or Brius Management Company, Inc.; by that I

14  mean are you, you know, a director, an officer, an

15  employee?

16     A.   No.

17          MR. WAGNER:  Objection.  Compound.

18  BY MS. WENDELL:

19     Q.   None of those things?

20     A.   Correct.  None of -- none of the above.

21  For both entities, none of the above.

22     Q.   Okay.  And have you done any other work

23  with either of those entities -- well, let me put

24  it --

25          Have you done any work for Brius, LLC,



Page 27

1   other than either as verifying discovery responses

2   or sitting as a PMK?

3       A.   No.

4       Q.   Same question for Brius Management Company,

5   Inc.

6       A.   No.

7       Q.   Are you able to testify as to the records

8   retention for Oxnard Manor?

9            (Certified Reporter interrupted for
             clarification of the record.)

10           MR. WAGNER:  I said objection.  That was

11  not on the agreed list of topics, so we will -- we

12  will not be producing him on that topic.

13           MS. WENDELL:  So you are instructing him

14  not to answer?

15           MR. WAGNER:  Yeah, he hasn't -- he hasn't

16  been prepared, you know -- he has not been prepared

17  on -- on that topic.

18           MS. WENDELL:  And is the same -- will you

19  raise the same objection regarding the records

20  retention for Brius, LLC, and Brius Management

21  Company, Inc.?

22           MR. WAGNER:  Correct.

23           MS. WENDELL:  And the same for Rockport --

24  excuse me, Rockport Administrative Services, Inc.?

25           MR. WAGNER:  Correct.



Page 28

1      BY MS. WENDELL:

2      Q.    Okay.  Can you please tell me what steps or

3   what was done to search for and produce the

4   documents in responses to Hallmark's first set of

5   request for production documents in this action?

6           MR. WAGNER:  I'm going to -- I'm going to

7   object to the extent it calls for communications

8   protected by the attorney-client privilege.

9           To the extent you know, Mr. Kaye, based on

10   review of the documents or otherwise outside the

11   communications of counsel, you can answer, but

12   don't, you know, answer simply on the basis of

13   communications with counsel.

14           THE WITNESS:  I don't have any independent

15   information outside of, you know, contacting with

16   counsel in that respect.

17           MS. WENDELL:  Let's go to the first

18   exhibit, which should be the Notice of Deposition.

19   I just want to make sure we get this in.

20           Hello?

21           MR. WAGNER:  Are you -- are you going to

22   publish these -- are you going to publish these on

23   the screen or how do you want to do the exhibits?

24           MS. WENDELL:  These should be published on

25   the screen and I believe that I sent --



Page 36

1   the initial complaint and the first amended

2   complaint.  I think it's clarifying that it really

3   was under both of those policies.  That's the extent

4   of what I would be able to testify regarding that.

5        Q.   Okay.  And do you have any experience in

6   insurance law?

7        A.   Insurance defense or insurance coverage.

8        Q.   Insurance coverage?

9        A.   No.

10       Q.   And other than that, do you have any

11   information on the first amended complaint?

12       A.   Not without looking at the -- at the

13   complaint and ...

14       Q.   Okay.  Well, we'll -- we'll get to that

15   later.

16       A.   Okay.

17       Q.   Okay.  And did you review -- or did you

18   receive -- let me ask the first -- this -- or when

19   did you -- excuse me -- strike that.

20            When did you first receive Hallmark's

21   letter to Rockport for Oxnard in -- that was dated

22   in February of 2019?

23       A.   Is that the denial of the claim?

24       Q.   Yes, that would be the first letter.

25       A.   I -- I recall seeing it fairly recently



Page 37

1    over the past couple of days.

2        Q.    Okay.  And was that the first time you saw

3    it?

4        A.    Yes.

5        Q.    Okay.  When did you first receive

6    Hallmark's letter to Thomas Falzarano of the

7    Bookwood Group, dated in June 2019?

8        A.    Right.  I've seen Mr. Falzarano's

9    correspondence to Hallmark, and I do recall seeing

10   the declination on the part of Hallmark.  I don't

11   recall distinctly a second letter, but --

12       Q.    So you don't -- you don't recall receiving

13   the June 2019 Hallmark letter to Mr. Falzarano?

14       A.    I'm not sure --

15             MR. WAGNER:  Objection.  Misstates his

16   testimony.

17             Go ahead.

18             THE WITNESS:  I'm not sure -- I saw -- I

19   saw the declination.  I'm not sure if the

20   declination was February or June of 2019, but I

21   would need to -- if you show it to me, we can --

22   I'll be happy to answer questions on it.

23       BY MS. WENDELL:

24       Q.    Sure.  We'll go to that.

25             So you recall receiving one letter but not



Page 44

1    claim?

2        A.    So my understanding is that Ms. DeSoto was

3    injured when the staff was trying to essentially

4    turn her in her -- in her bed.

5             The description -- I mean, it's in the --

6    it's in the complaint -- that's I believe the DeSoto

7    file -- you know, is that she's a very large woman,

8    approximately 400 pounds, and that she fell

9    face-first onto the floor and suffered damages as a

10   result, physical damages as a result of falling

11   face-first on the floor and with her enormous

12   weight, the -- the impact was significant.

13       Q.    When was the first time you received the

14   DeSoto complaint?

15       A.    Again, it would have been in the past few

16   days in preparation for today's deposition.

17       Q.    And you had not received the DeSoto

18   complaint before then; correct?

19       A.    Correct.

20       Q.    Do you have -- are you aware of when the

21   DeSoto claim was first sent to Hallmark?

22            MR. WAGNER:    Object to the form.    Vague.

23   Essentially calls for a legal conclusion.

24            THE WITNESS:    My -- my understanding is I

25   think it was Amwin, A-M-W-I-N [sic], had -- had



Page 46

1    your many years of legal knowledge?

2              MR. WAGNER:  Ob- -- objection.  Hold on one

3    sec.

4              Counsel, he's not offered here as legal

5    expert.  You can ask him to his knowledge and

6    understanding.  He's not being tendered here as a

7    legal expert.  Moreover, as he already testified,

8    he's certainly not an insurance expert.

9              You can answer to the best of your

10   understanding, Mr. Kaye.

11             THE WITNESS:  It's -- again, just -- it's

12   based on just a, you know, an enormous volume of

13   documents, so based upon a, you know, a review of --

14   of those documents, it looked -- none of these

15   documents specifically set forth, you know, like in

16   a formal operating agreement or in some form of a

17   contract where the parties are specifically

18   identified and where their roles are, but it

19   looked -- I believe there's at least one, probably

20   two emails in which Amwin is directing these --

21   tendering the claims to -- to Hallmark, so that's --

22   that's the extent of my knowledge --

23        BY MS. WENDELL:

24        Q.   Okay.  And they were --

25             (Simultaneous cross-talk.)



Page 48

```
1              (Recess at 9:53 AM to 10:05 AM.)
2              THE VIDEOGRAPHER:  The time is 10:05 AM.
3    We are back on the record.
4              MS. WENDELL:  Okay.  Can we please pull up
5    I believe the second exhibit, Exhibit B.
6              (Exhibit B, Joint Appendix of Exhibit 2, was
               marked for identification.)
7              MS. WENDELL:  Okay.  Can you go down two
8    pages?
9       BY MS. WENDELL:
10      Q.   Okay.  Sir, have you ever seen the Hallmark
11   policies before?
12      A.   Yes.
13      Q.   Okay.  Did you review them?
14      A.   Yes, briefly.
15      Q.   Briefly.
16           And you do not have a background in
17   insurance coverage; correct?
18      A.   That is correct.
19      Q.   Okay.  For what reason did you review the
20   documents, the -- I'm sorry, Exhibit B?
21      A.   It was provided by counsel through you,
22   so --
23      Q.   Within -- when was it first provided to
24   you?
25      A.   I think these exhibits were provided
```



Page 49

1    relatively recently.

2        Q.    Within the last week?

3        A.    Yes.

4              Are you okay if I just look on another

5    device, open up the documents?

6        Q.    Well, I wanted to make sure that we're

7    looking at the same document.

8        A.    Okay.  You can go ahead --

9        Q.    How much --

10       A.    -- and go pages.

11       Q.    Exactly.

12             How much time did you spend going over

13   Exhibit B -- and this would -- excuse me.  This is

14   the '17/'18 policy.

15       A.    Approximately five to ten minutes.

16       Q.    For what purpose?

17       A.    Again, I was told it was going to be an

18   exhibit for this deposition.

19       Q.    Okay.  But you -- the first time you ever

20   saw this policy was within the last week; correct?

21       A.    Correct.

22       Q.    Did you provide any kind of opinion --

23       A.    No.

24       Q.    -- regarding the '17/'18 policy attached as

25   Exhibit B?



Page 50

```
 1      A.    Again, I'm not -- I'm not an insurance

 2   coverage expert, so I wouldn't -- I wouldn't give an

 3   opinion.

 4      Q.    Okay.  So the answer is no?

 5      A.    Correct.

 6            MS. WENDELL:  Let's go to Exhibit C.

 7            (Exhibit C, Joint Appendix of Exhibit 3, was
              marked for identification.)

 8            MS. WENDELL:  Go down two pages, please.

 9   BY MS. WENDELL:

10      Q.    Have you seen this -- have you seen this

11   document before?

12      A.    Can I trouble you to go to the next pages

13   or so?

14      Q.    Sure.

15            Keep going.

16            And this would be the '18/'19 Hallmark

17   policy?

18      A.    Yes, I've seen this.

19      Q.    When was the first time you saw this

20   policy?

21      A.    Again, at the same time as -- as the prior

22   exhibits --

23      Q.    That would be with- -- within the last

24   week?

25      A.    Correct.
```



Page 51

1     Q.   Did you review this document?

2     A.   Briefly.

3     Q.   Approximately how much time did you spend

4 reviewing the document?

5     A.   Five to ten minutes.

6     Q.   For what purpose?

7     A.   Same as before.  I was told it was an

8 exhibit for this deposition.

9     Q.   Did you form an opinion with respect to

10 coverage under the '18/'19 Hallmark policy?

11    A.   I -- again, I'm not -- I'm not a -- I'm not

12 a coverage attorney.  I took my basic reading of

13 the, you know, the four corners of the -- of the

14 agreement.

15    Q.   Did you form an opinion whether -- whether

16 or not there was coverage under the '18/'19 policy;

17 yes or no?

18    A.   It appears there's coverage.

19    Q.   On what basis?

20    A.   Again, basic review of what this is.

21        MR. WAGNER:  Hello?  Hello?

22        MS. WENDELL:  Hello?

23        MR. WAGNER:  Hello?

24        Hi.  Sorry.  Can everyone hear me?

25        MS. WENDELL:  Yes.



Page 52

1        MR. WAGNER:  Okay.  Let's slow down.  I'm

2   making objections and you guys are talking over my

3   objections.  Let's make sure we're getting a clean

4   record, because no one was even pausing for my

5   objections.

6        Everyone can hear me?

7        MS. WENDELL:  I can.

8        MR. WAGNER:  Okay.  So what I said is --

9   what I had said before, he's not being offered as an

10  expert on insurance coverage; that's the objection.

11        THE WITNESS:  I don't think your objections

12  were heard during the dep- -- were -- were

13  audible -- were audibly heard.

14     BY MS. WENDELL:

15     Q.   Right.  Now I -- okay.

16        Okay.  So you've -- kind of going back.

17        You've seen the '17/'18 policy for the

18  first time within the last week; correct?

19     A.   Yes.

20     Q.   You seen the '18/'19 policy, Hallmark

21  policy, for the first time within the last week;

22  correct?

23     A.   Correct.

24     Q.   You had no involvement in obtaining the

25  policy -- either policy; correct?



Page 53

1      A.    Correct.

2      Q.    Did you speak with anyone at Oxnard Manor

3   with respect to the '17/'18 policy?

4      A.    No.

5      Q.    Did you speak with anyone other than

6   Mr. Wagner with respect to the '17/'18 policy?

7      A.    No.

8      Q.    Did you speak with anyone at Oxnard Manor

9   regarding the '18/'19 policy?

10      A.    No.

11      Q.    Did you speak with anyone other than

12   Mr. Wagner with respect to the '18/'19 policy?

13      A.    No.

14      Q.    And you did not -- you had no involvement

15   in obtaining the '18/'19 policy; correct?

16      A.    That is correct.

17          MS. WENDELL:  Let's go to Exhibit D.

18          MR. DRAKE:  D as in David?

19          MS. WENDELL:  Correct.  Go down one.  No.

20   No.  That's not it.

21          Okay.  But, since it's up --

22          EXHIBIT TECHNICIAN:  And this is -- this is

23   Oxnard Manor LP's Responses to Defendant Hallmark

24   Specialty Insurance Company's Request for

25   Admissions, Set One?



Page 57

```
 1              MS. WENDELL:  Right.
 2              MR. WAGNER:  You can answer what your
 3    purpose -- well, if you know what my purpose is, you
 4    know, without speculating, you could do it.
 5    Whatever your purpose in reviewing is, you can
 6    answer as to your purpose in reviewing.
 7         BY MS. WENDELL:
 8         Q.   What was your purpose in reviewing it,
 9    Mr. Kaye?
10         A.   Anticipation of today's deposition.
11         Q.   Okay.  And we'll come back to this.
12              I will get the proof of service.
13              Okay.  Let's go to Exhibit E.
14              Please go up.
15              (Exhibit E, Joint Appendix of Exhibit 5, was
                marked for identification.)
16         BY MS. WENDELL:
17         Q.   Do you recognize this document, sir?
18         A.   Yeah.
19         Q.   How do you recognize it?
20         A.   Well, it's -- it's the email that I believe
21    we were discussing before and I -- it appears that
22    it was -- it was sent earlier than I -- I must have
23    transposed some dates here, because it says it was
24    sent -- as opposed to being early 2019, it was sent
25    in early 2018.  It says it was sent on January 30th
```



Page 58

1    of 2018.

2          But I believe this is an email from

3    Mr. Riss in which -- that he had received a -- a

4    request for documents in this DeSoto matter that

5    we've been talking about, and he was -- it looks

6    like, you know, coming in for -- to -- here, sent to

7    claims@hallmarkgrp.com and Eli Fogel, so he's

8    sending it -- he's tendering -- putting the

9    insurance carrier on notice that there's something

10   possibly percolating up.

11         BY MS. WENDELL:

12         Q.   Okay.  And when was the first time you saw

13   this document?

14         A.   Again, in the past few days.

15         Q.   And you received that from Mr. Wagner?

16         A.   Yes.

17         Q.   For what purpose?

18         A.   In preparation for today's deposition.

19         Q.   Had you seen this document at any time

20   before the -- the last week?

21         A.   No.

22         MS. WENDELL:  Let's go with the

23   next dep- -- next exhibit, which will be F.

24         Okay.  Can you go up one, please.

25   / / /



```
                                                        Page 59
 1            (Exhibit F, Joint Appendix of Exhibit 8, was
              marked for identification.)
 2       BY MS. WENDELL:
 3       Q.   This is -- this is Exhibit F, and it is
 4   a --
 5            Do you recognize this document, sir?
 6       A.   Yeah, I believe it's -- again, I'd like to
 7   see the rest of the document, but --
 8       Q.   Sure.
 9       A.   -- it looks --
10       Q.   Let's go through it and ignore any hand --
11   any markings.
12       A.   Right.  This is from attorney, Thomas
13   Falzarano.
14       Q.   Did you receive this letter, sir?
15       A.   Yes.
16       Q.   Did you receive it for the first time in
17   the last week?
18       A.   Yes.
19       Q.   Did you ever see this letter prior to the
20   last week?
21       A.   No.
22       Q.   Was this letter provided to you by
23   Mr. Wagner?
24       A.   Yes.
25       Q.   Are you prepared to provide any further
```


MAGNA
LEGAL SERVICES

Page 60

1    information regarding this letter?

2              MR. WAGNER:  Objection.  Vague.

3              Do you want to ask him a question or --

4       BY MS. WENDELL:

5       Q.   Exhibit F, is there anything -- I mean is

6    there anything that you would like to discuss with

7    respect to Exhibit F?  Are there any -- is there

8    anything that you'd like to testify to on behalf of

9    Oxnard Manor?

10             MR. WAGNER:  Object to the form of the

11   question.

12             THE WITNESS:  I think the document speaks

13   for itself.  It's -- it's a lengthy analysis by

14   attorney Falzarano, you know --

15      BY MS. WENDELL:

16      Q.   Did you have any -- did you have any input

17   into this letter?

18      A.   No.

19             MS. WENDELL:  Okay.  Let's go to the next

20   one.

21             Next exhibit, please.

22             (Exhibit G, Joint Appendix of Exhibit 9, was

23             marked for identification.)

23      BY MS. WENDELL:

24      Q.   Have you seen this -- this is exhibit --

25   this is Exhibit G, a letter from Mr. Falzarano,



Page 61

1    dated August 1st, 2019.

2         Do you recognize this document?

3    A.   Yes.

4    Q.   What -- when was the first time you seen

5    this document?

6    A.   Within the past week.

7    Q.   Did you ever obtain a copy of this document

8    prior to the last week?

9    A.   No.

10   Q.   Did you review this document?

11   A.   I've -- I've looked it over.

12   Q.   Do you have any additional facts regarding

13   this document?

14        MR. WAGNER:  Objection.  Vague.

15   BY MS. WENDELL:

16   Q.   Again, Exhibit G.

17   A.   Is there more to this document that you

18   want me to look at?

19   Q.   Sure.

20        Let's go -- let's go through the document.

21   A.   Again, it's -- it's attorney Falzarano's

22   representation as of August 1 of 2019.

23        I believe as more information came to

24   light, specifically in terms of the policies that

25   were at play, my understanding is that the -- you



Page 64

1    over a year later was still active.  That's the

2    point I'm making.

3        BY MS. WENDELL:

4        Q.    Okay.  And on what do you base your last

5    answer?

6        A.    Again, my overall review.  I thought that

7    it was already -- had been disposed of, but I

8    mean --

9        Q.    You do not --

10       A.    Maybe -- Maybe I'm mistaken.

11             I know it went through three iterations.

12   It started in Superior Court, ended up in

13   arbitration.  So, perhaps I'm -- I'm thinking to

14   myself that -- I'm talking only about the Superior

15   Court piece of it, but ...

16       Q.    Is it fair to say that you just don't know?

17       A.    Yeah.  I'll give you that.

18       Q.    But you did receive this letter?

19       A.    Yeah.

20       Q.    You did review it?

21       A.    Correct.

22       Q.    You received it within the last week?

23       A.    Correct.

24       Q.    For the first time?  For the first --

25       A.    Correct.



Page 65

```
 1      Q.    From Mr. Wagner?

 2      A.    Correct.

 3      Q.    Is it fair to say that you received all

 4  documents -- and I think you testified to this, but

 5  I want to be -- I want to be -- you know, I want to

 6  make sure I understand.

 7            All the documents you received and reviewed

 8  for your deposition today, you received from

 9  Mr. Wagner within the last week?

10            MR. WAGNER:  Objection.  Misstates his

11  prior testimony.

12            THE WITNESS:  Right.  So I did -- I started

13  receiving information and documents about -- I think

14  I mentioned earlier at the beginning of the

15  deposition, about six, seven weeks ago.  So, then I

16  received more documents within the past week, but I

17  did receive initially certain documents much earlier

18  than six, seven weeks ago.

19      BY MS. WENDELL:

20      Q.    Okay.  You said six to seven weeks ago was

21  the first time you received any documents in

22  preparation for your deposition today?

23      A.    Correct.

24      Q.    Do you recall what documents you

25  received -- so you -- you received two separate
```



Page 66

1   groups of documents; is it fair?

2          MR. WAGNER:  Objection.  Misstates his

3   prior testimony.

4          THE WITNESS:  Yeah.  I think the -- the

5   documents have come in -- more than two -- two

6   groups.  I think they've come as -- in multiple

7   batches over periods of time.

8   BY MS. WENDELL:

9     Q.   Okay.  So, six to seven weeks ago, you

10  started receiving -- you first started -- started

11  receiving documents in preparation for your

12  deposition today; correct?

13    A.   Correct.

14    Q.   And you had not received any of those

15  documents prior to six to seven weeks ago; correct?

16    A.   I believe so, yeah, correct.

17         MS. WENDELL:  Okay.  Let's go to the next

18  exhibit.

19         (Exhibit H, Joint Appendix of Exhibit 10,

           was marked for identification.)

20         MS. WENDELL:  This will be Exhibit -- this

21  will be Exhibit H.

22         EXHIBIT TECHNICIAN:  H as in Harry?

23         MS. WENDELL:  H as in Harry, yes.

24  BY MS. WENDELL:

25    Q.   Okay.  This is the complaint that was filed



Page 67

 1    in the DeSoto claim, or the DeSoto litigation, this
 2    complaint, dated or filed October 24, 2018.
 3             Sir, have you seen this document before?
 4       A.   Yes.
 5       Q.   When was the first time you saw this
 6    document?
 7       A.   I know I've reviewed it in the past week or
 8    so, but I'm not sure if I've seen it before,
 9    but I -- I definitely have seen it in the past week.
10       Q.   Okay.  So is it fair to say that you first
11    reviewed all the documents you received from
12    Mr. Wagner in preparation for your deposition today
13    within the last week?
14             MR. WAGNER:  Objection.  Misstates his
15    prior testimony.
16             THE WITNESS:  No, I mean -- as I said, I
17    started getting documents as far back as, let's say
18    seven weeks ago, so I would open emails and look at
19    documents then.
20             But, again, the number of documents in this
21    case is -- is quite a bit more than other cases
22    where I've sat as a PMK.  I'm usually looking at
23    distinct corporate issues, and I'm looking at
24    organizational documents, filings with the Secretary
25    of State, and things like that and, you know, you

Page 71

1    exhibit.  This is Exhibit I.

2              (Exhibit I, Joint Appendix of Exhibit 11,

                 was marked for identification.)

3         BY MS. WENDELL:

4         Q.    It is a letter from Hallmark to Yalda Neil

5    of Rockport Healthcare Services, and I'll represent

6    that was at the instruction of Mr. Riss of Amwins.

7    It's dated February 4th, 2019.

8              Sir, have you reviewed this document?

9         A.    Briefly, yes.

10        Q.    Okay.  And by briefly, do you want to go

11   through it or do you recall --

12             (Simultaneous cross-talk.)

13             THE WITNESS:  If you'd like to show it.

14             MS. WENDELL:  Okay.  Let's go through the

15   document.

16             Hello?  Let's go through the document,

17   please.  Thank you.

18        BY MS. WENDELL:

19        Q.    And, again, ignore any brackets.

20             Okay.  Sir, have you seen this document

21   before?

22        A.    Again, I testified that I briefly looked it

23   over, so yes.

24        Q.    Okay.  When was the first time that you

25   received it, if you recall?



Page 72

1      A.    I believe in the past week.

2      Q.    And when you say you reviewed it briefly,

3  what do you mean -- by how -- how much time did you

4  spend?

5      A.    Again, five to ten minutes.

6      Q.    Did you receive this document from

7  Mr. Wagner?

8      A.    Yes.

9      Q.    For what purpose?

10     A.    Preparation for today's deposition.

11     Q.    Do you have any -- anything to offer with

12  respect to --

13          MR. WAGNER:  Objection.  Vague.

14  BY MS. WENDELL:

15     Q.    Did you analyze --

16          MR. WAGNER:  I apologize.  I thought you

17  were done.

18          MS. WENDELL:  Okay.  I'm sorry.

19  BY MS. WENDELL:

20     Q.    Did you read the document.

21     A.    I looked at it briefly.  It's

22  20-some-odd -- 28 pages long.  It would be hard to

23  read a 28-page, single-space-typed legal document

24  regarding an area of law that I'm not an -- an

25  expert in and -- you know, in five to ten minutes.



Page 73

```
1    So, it's more of a -- a cursory review.
2        Q.   Okay.  So you have no testimony to offer
3    with respect to Exhibit I?
4            MR. WAGNER:  Objection.  Misstates --
5    misstates the witness' testimony.  And vague.
6            MS. WENDELL:  Okay.  Okay.  Can you hang on
7    just a second?
8            THE WITNESS:  Sure.
9            MS. WENDELL:  Excuse me.
10           (A brief pause in the proceedings.)
11   BY MS. WENDELL:
12       Q.   Okay.  I believe my question was, do you
13   have any testimony to offer on Exhibit I?
14           MR. WAGNER:  Same objection.
15           THE WITNESS:  Again, I -- I understand this
16   is your client's position, and I also understand
17   that, you know, Oxnard viewed things quite
18   differently, and I'm not here to sit as an insurance
19   coverage expert to give a legal opinion on this, but
20   I do know that the representations that are being
21   made here have been, you know, significantly
22   objected to and, you know, contrary positions have
23   been taken by -- by Oxnard.
24   BY MS. WENDELL:
25       Q.   Have you seen any documentation or
```



MAGNA ▶
LEGAL SERVICES

Page 78

1    the other party is being represented.

2         But the upshot of it is he's addressing --

3    and possibly the most important part is he's

4    specifically stating that he's addressing the

5    earlier letter, so --

6         MS. WENDELL:  Okay.  Okay.  Can we please

7    put up the next exhibit?  I believe this is

8    Exhibit J.  This is a letter dated June 6, 2019,

9    from Hallmark to Thomas Falzarano.

10        (Exhibit J, Joint Appendix of Exhibit 12,

              was marked for identification.)

11   BY MS. WENDELL:

12   Q.   Sir, have you seen this document before?

13   A.   I believe so, yes.

14   Q.   And where you get this document from?

15   A.   It would have been from Mr. Wagner.

16   Q.   Did you review this document?

17   A.   Briefly.

18        MS. WENDELL:  Okay.  Let's go through it so

19   he can see the entire document.

20   BY MS. WENDELL:

21   Q.   Is that the letter you saw?

22   A.   I believe so, yes.

23   Q.   And you reviewed it for what purpose?

24   A.   Preparation for today's deposition.

25   Q.   When was the first time you saw this



Page 79

1    document?

2         A.    Within the past week.

3         Q.    Did you -- do you have anything to offer

4    with respect to --

5              MR. WAGNER:  Objection.  Vague.

6              (Certified Reporter interrupted for

                clarification of the record.)

7              MR. WAGNER:  Objection.  Vague.

8         BY MS. WENDELL:

9         Q.    Do you have anything to offer with respect

10   to this letter on behalf of Oxnard Manor?

11             MR. WAGNER:  Objection.  Vague.  I mean --

12   or if you're asking about each word, it's compound,

13   but it's not -- that's not a question.

14             You may answer.

15             THE WITNESS:  Again, just that Oxnard Manor

16   disagrees.

17        BY MS. WENDELL:

18        Q.    Okay.  Disagrees with what was said in the

19   letter.  Okay.

20             Okay.  And just to be clear, the exhibits

21   that we've shown so far, you -- you haven't

22   discussed any of them with Oxnard Manor; correct?

23             MR. WAGNER:  Objection.  Calls for a legal

24   conclusion.  Vague.

25             You may answer.



Page 80

1          THE WITNESS:  No.

2          MS. WENDELL:  Okay.  Let's go for the next

3    exhibit.  I believe -- I believe this is Exhibit K.

4          (Exhibit K, "CONFIDENTIAL" Joint Appendix of

5          Exhibit 13, was marked for identification.)

5    BY MS. WENDELL:

6    Q.   Sir, have you seen this document before?

7    A.   I believe so, yes.

8          MR. WAGNER:  This is -- this is Defendant

9    Oxnard Manor LP dba Oxnard Manor Healthcare Center's

10   Response to Plaintiff's Form Interrogatory, Set Two;

11   is that what we're looking at?

12         MS. WENDELL:  Yes.

13   BY MS. WENDELL:

14   Q.   And, sir -- I believe this is Exhibit K --

15   have you seen this document before?

16   A.   Yes, I believe so, yes.

17   Q.   From whom did you receive it?

18   A.   Mr. Wagner.

19   Q.   When's the first time that you rev- -- you

20   have reviewed it?

21   A.   Briefly, yes.

22   Q.   Yes.

23         MR. WAGNER:  The question was when.  The

24   question was when was the first time.

25         THE WITNESS:  In the past --



Page 86

1    reviewing the responses before signing the

2    verification.

3        BY MS. WENDELL:

4        Q.   But you didn't reach out to anybody at

5    Oxnard before your deposition today; correct?

6        A.   Correct.

7             MR. WAGNER:  Objection.  Vague.  Vague as

8    to Oxnard.

9        BY MS. WENDELL:

10       Q.   Well, let's -- have you ever spoken to

11   anybody at Oxnard Manor?

12            MR. WAGNER:  Same objection.

13            THE WITNESS:  Off --

14       BY MS. WENDELL:

15       Q.   Excuse me?

16       A.   Offhand I don't recall.

17            MS. WENDELL:  Okay.  Let's put up the next

18   exhibit.  This will be Exhibit L.

19            (Exhibit L, "CONFIDENTIAL" Joint Appendix of

                 Exhibit 15, was marked for identification.)

20            MR. WAGNER:  And this is the settlement

21   agreement and release; is that the title of the

22   document?

23            MS. WENDELL:  Correct.  Exhibit L is the

24   settlement agreement and release.

25   / / /



Page 87

```
 1      BY MS. WENDELL:

 2      Q.   Sir, have you seen this document before?

 3      A.   Yes.

 4      Q.   When was the first time you saw it?

 5      A.   Sometime over the past few weeks.  I'm not

 6  sure exactly when.

 7      Q.   Is -- was that the first time you ever saw

 8  this document?

 9      A.   Yes.

10      Q.   Did you have any involvement in negotiating

11  the settlement of Oxnard Manor in the DeSoto claim?

12      A.   No.

13      Q.   Did you have any involvement in preparing

14  the settlement agreement and release attached as

15  Exhibit L?

16      A.   No.

17      Q.   And the first time -- when was the first

18  time you reviewed the document?

19      A.   Again, sometime in --

20           MR. WAGNER:  Objection.  Asked and

21  answered.

22           THE WITNESS:  Sometime in the past couple

23  weeks.

24           MR. WAGNER:  Go ahead.

25  / / /
```



Page 89

1          MR. WAGNER:   -- protective order.  If you

2    look specifically at paragraph 6, it has a

3    confidentiality provision.

4          MS. WENDELL:  Okay.  We will -- but I want

5    to be able to submit it to the court.

6          MR. WAGNER:  Yeah, you can submit it under

7    seal.

8          MS. WENDELL:  Right.  But --

9          MR. WAGNER:  We're -- we're

10   designating this -- we're designating it as

11   confidential.  You're reserving your contention.  I

12   understand.

13         MS. WENDELL:  Right.  I'm reserving my

14   contention as to the confidentiality.

15     BY MS. WENDELL:

16     Q.   But, as -- as the PMK for Oxnard Manor, did

17   DeSoto settle for $400,000?

18     A.   I'm reading the agreement just like -- just

19   like you are.  That's what it appears to be the

20   number.

21     Q.   But you have no firsthand knowledge of the

22   settlement --

23         (Simultaneous cross-talk.)

24         THE WITNESS:  I have no knowledge beyond

25   the four corners of this settlement agreement in



Page 90

1    terms of the dollar amount that was the settlement

2    sum.

3        BY MS. WENDELL:

4        Q.    Okay.  But you received this document from

5    Mr. Wagner in preparation for your deposition today?

6        A.    Correct.

7        Q.    And you've reviewed it within the last --

8    last week?

9        A.    I don't recall exactly when I received it.

10   I think it was a few -- within the past few weeks.

11       Q.    Okay.  And you didn't receive it before

12   that time; correct?

13       A.    Correct.

14           MS. WENDELL:  Okay.  Let's go back one

15   page.

16       BY MS. WENDELL:

17       Q.    Okay.  And it says -- looking at the first

18   paragraph, last sentence, the effective date of this

19   agreement is January 9th, 2020; is that correct?

20       A.    It --

21           MR. WAGNER:  Are you asking -- are you

22   asking him that's what -- hold on one sec.

23           MS. WENDELL:  If that's what the document

24   says, yes.

25           THE WITNESS:  The document does state that



Page 94

1    Services, LLC, Brius Management Company, Inc.,

2    Brius, LLC, and Oxnard Manor LP dba Oxnard Manor

3    Healthcare Center?

4            MR. WAGNER:  You're asking if that's what

5    the document states?

6            MS. WENDELL:  I'm asking if the -- the

7    definition of defendants -- it says defendants after

8    that.  If the term defendants in this agreement

9    include the defendants that I just mentioned,

10   starting with Shlomo Rechnitz and ending with Oxnard

11   Manor.

12           THE WITNESS:  That's what the document

13   states, that those --

14           MS. WENDELL:  Okay.  Let's go to --

15           THE WITNESS:  Just a second.  Can I please

16   finish?  Can I please finish?

17           MR. WAGNER:  Ms. Wendell, yeah, let's let

18   him finish.

19           MS. WENDELL:  Okay.

20           THE WITNESS:  That's what the document

21   states as those -- that long laundry list are the

22   defendants, but I'm not -- I'm not here -- I wasn't

23   negotiating this agreement.  I wasn't in the room,

24   so beyond just being able to say that's what the

25   document states, I can't give you any more than



Page 95

```
 1   that.

 2        BY MS. WENDELL:

 3        Q.   Okay.  Do you have any -- I mean, you

 4   received this from Mr. Wagner.  You would -- do you

 5   believe that it's a true and correct copy of the

 6   settlement agreement and release?

 7        A.   I believe that the -- the document is -- is

 8   the settlement agreement, but I also know that

 9   while -- I know two things:

10             One is just my own practice that it's --

11   it's standard forum to list every single party

12   that's named in a settlement.  You want to be as

13   global as possible.  It would be malpractice to --

14   to not do that, and it doesn't necessarily mean who

15   the actual party is that's paying the money.

16             That's very often in settlements where

17   parties are listed who don't pay anything.  They're

18   just listed so that they get their release.

19             So, here I know that Oxnard Manor paid all

20   the money, so ...

21        Q.   How do you know that?

22        A.   That's -- that's my understanding in terms

23   of my discussions with counsel and that's the basis

24   of my understanding.

25        Q.   Do you have any firsthand knowledge that
```



Page 96

1    Oxnard Manor was the one that actually paid the

2    settlement?

3        A.    I would have to review their -- go back

4    into those 10,000 or so documents.

5        Q.    I'm asking for firsthand knowledge.  You

6    were not there at the time the settlement was

7    entered into; correct?

8        A.    Correct.

9        Q.    And you did not pay to settle -- the

10   settlement amount on behalf of Oxnard Manor;

11   correct?

12       A.    Correct.

13       Q.    Okay.  So you don't know who paid when or

14   on behalf of who; correct?

15            MR. WAGNER:  Objection.  I think it

16   misstates his testimony.  He said he reviewed

17   documents that reflect payments, and he could review

18   them to check who paid.  That is a form of

19   firsthand.

20            If you're saying firsthand means he wasn't

21   there in 2020, so stipulated, but objection.  Vague

22   on -- and/or misstates his prior testimony.

23            MS. WENDELL:  Okay.  So let's go to page 2.

24            MR. WAGNER:  Can we -- oh, are you -- if --

25   are you staying with this document?



Page 103

1    not like the answer, but it was answered.

2           Go ahead, Mr. Kaye.

3           THE WITNESS:  I'm happy to go through the

4    complaint -- this complaint if you'd like.  We can

5    go through it.

6       BY MS. WENDELL:

7       Q.   But that is not something of which you have

8    personal knowledge; correct?  The facts that are --

9    whatever is in the complaint, you did not have any

10   involvement with; correct?

11      A.   Did not a draft the first amended

12   complaint, no.

13      Q.   And you were not involved -- as we've

14   established earlier, you were not involved in the

15   DeSoto -- DeSoto claim or the Foreman claim;

16   correct?

17      A.   That is correct.

18      Q.   And the first time that you have seen any

19   documents in this matter was six to seven weeks ago;

20   correct?

21      A.   Correct.

22      Q.   And many of the documents that we've --

23   we've reviewed today, you reviewed within the last

24   week; correct?

25      A.   Some of those documents, correct, in the

Page 104

1    past week, yes.

2        Q.    So if we go through the complaint, what is

3    alleged, you have no firsthand knowledge of;

4    correct?

5        A.    Then why even pose the question to me of

6    what the -- what the facts are that Oxnard is -- is

7    claiming that Hallmark did wrong.

8        Q.    Because you are the PMK for Oxnard Manor,

9    and a complaint is a complaint.  It does not

10   include -- and sometimes it does not include all the

11   facts.

12            So as the PMK, we are entitled to know what

13   are the facts other than the coverage determination

14   that Oxnard Manor thinks Hallmark did wrong in its

15   claim handling?

16            MR. WAGNER:  Asked and answered for three

17   times.

18            MS. WENDELL:  Not answered.

19            MR. WAGNER:  You don't like the answer.  He

20   referred you to the complaint, as he's done multiple

21   times.  That's his answer.

22       BY MS. WENDELL:

23       Q.    Okay.  Let's just -- let's just -- then I

24   want to button it down.

25            You have no other facts other than what's



Page 107

1  the complaint with you.  This is the fourth, fifth
2  time you're asking this question.
3          MS. WENDELL:  Okay.  So, let's go --
4  let's -- and now -- and now -- because at this point
5  we don't have any facts separate from the complaint,
6  so let's go through the complaint.
7          I did send that in, and we will attach it
8  as Exhibit M as in Mary.
9          (Exhibit M, First Amended Complaint for: (1)
            Breach of Contract; (2) Breach of Contract;
10          (3) Breach of Implied Covenant of Good
            Faith and Fair Dealing; (4) Unfair Business
11          Practices; (5) Unjust
            Enrichment/Restitution, dated May 17, 2023,
12          was marked for identification.)
13      BY MS. WENDELL:
14      Q.   Okay.  Please review the complaint.
15  Please -- let's go through the complaint, first
16  amended complaint.
17      A.   So, if -- I'm going -- to go through this,
18  I'm not going to be able to go through this at
19  lightning speed as the pages are turning here.  I
20  need to see -- I'll need to pull it up on my phone
21  and -- and -- and go through it page by page.
22      Q.   Okay.  But I want to make sure -- okay.
23          But before I say anything, do you recognize
24  this document?
25      A.   Yes.



Page 108

1    Q.    When did you first see the document?

2    A.    In the past few weeks.

3    Q.    When did you first review the document?

4    A.    Within about a week ago.

5    Q.    From whom did you receive the document?

6    A.    From Mr. Wagner.

7    Q.    Did you see -- have you ever seen this

8  document, which is the first amended complaint of

9  Oxnard in this manner, prior to a couple weeks ago?

10   A.    No.

11         MR. WAGNER:  Joanne, can you -- can you

12  send -- I don't see this in the exhibits you sent.

13  Can you send this as an email so I can forward this

14  separately to the witness?  You can put it in

15  chat -- you can email it or put it in the chat,

16  whatever is easier.

17         MS. WENDELL:  I'm going to forward it.  I

18  did send it to you this morning at 7:24, but I'll do

19  it again.

20         I'm sending it to you, Avi; right?

21         MR. WAGNER:  Yeah.  That's fine.  I can

22  pass it on to him.

23         MS. WENDELL:  Okay.  Okay.  It's on its

24  way.

25         MR. WAGNER:  Okay.  I've forwarded it to



Page 111

```
1      A.    Give me a minute.

2            And 84 through 87.

3      Q.    Okay.  Anything else?

4      A.    89 through 97.  That's about it.

5      Q.    Okay.  And as the fact witness for Oxnard

6   Manor, you have no personal knowledge of any of the

7   allegations you just identified; correct?

8            MR. WAGNER:  Objection to the form and to

9   the extent it mischaracterizes his role.

10  Specifically he's here as a 30(b)(6) designee.

11           If he testifies with that clarification, he

12  may answer.

13           THE WITNESS:  I'm not a -- a percipient

14  witness to these allegations of the complaint.

15      BY MS. WENDELL:

16      Q.    And you do not work for Oxnard Manor;

17  correct?

18      A.    Correct.

19           MR. WAGNER:  Objection.  Vague.

20           MS. WENDELL:  Okay.  Let's go to the next

21  document, which will be Exhibit N.

22           EXHIBIT TECHNICIAN:  I'm sorry.  You cut

23  out after saying Exhibit N.

24           MS. WENDELL:  Exhibit N, yes, the next one

25  will be Exhibit N.  So if we can take down the
```



Page 123

1    Okay.  Thank you.

2           MS. WENDELL:  Okay.  Sure.

3           Okay.  The next one is Exhibit P as in

4    Paul, and it is a Professional Services Agreement

5    between Oxnard Manor and Rockport Healthcare.

6           (Exhibit P, "CONFIDENTIAL" Professional

              Services Agreement, was marked for

7             identification.)

8    BY MS. WENDELL:

9      Q.    Sir, have you seen this document before?

10     A.    Yes.

11     Q.    When did you first see it?

12     A.    I've seen versions of this agreement

13   repeatedly over the past few years, so --

14     Q.    In what context?

15     A.    Rockport has contractual relationship with

16   many facilities.

17     Q.    Many skilled nursing facilities?

18     A.    Correct.

19     Q.    Have you ever -- I think we discussed this,

20   but have you ever done any work for Rockport?

21     A.    No.

22     Q.    And you don't -- you have no relationship

23   with Rockport; correct?

24     A.    I -- I've never done -- I've never

25   represented Rockport nor have I been a PMK for



Page 124

```
1    Rockport.
2        Q.   Okay.  And you're not an employee or a
3    director or partner or anything like that of
4    Rockport; correct?
5        A.   I have no entity or board position or
6    anything like that, no.
7        Q.   Okay.  So this particular one with Oxnard,
8    when did you first see this document?
9        A.   Again, past a couple weeks.
10       Q.   When was the first time you reviewed
11   Exhibit P?
12       A.   I just gave it a cursory review, because
13   again, I've seen -- I've seen this form of agreement
14   on many occasions, so ...
15            MS. WENDELL:  Okay.  If we can go to the
16   second page.
17       BY MS. WENDELL:
18       Q.   Now, I believe -- my recollection is you
19   earlier testified that Rockport does not provide any
20   medical services.
21       A.   That is correct.
22            MR. WAGNER:  Objection.  Misstates -- okay.
23       BY MS. WENDELL:
24       Q.   At the very top, it says, "Nursing Direct
25   Care Services, services relating to the direct care
```



Page 135

1    A.    I think it was a couple days ago I received
2    this.
3    Q.    And you -- did you receive this from
4    Mr. Wagner?
5    A.    Yes.
6    Q.    And what was the purpose of this -- of
7    reviewing this document?
8    A.    Preparation for today's deposition.
9         MS. WENDELL:  Okay.  If we can take that
10   down.  Thank you.
11        Okay.  The next one is Exhibit R.
12        (Exhibit R, "CONFIDENTIAL" Plaintiff's
          Mandatory Settlement Conference Brief,
13        dated January 2, 2020, was marked for
          identification.)
14   BY MS. WENDELL:
15   Q.    Sir, have you received this document
16   before?
17   A.    Yes.
18   Q.    And when did you first receive it?
19   A.    I think approximately a week or so, maybe
20   more.
21   Q.    And who did you receive it from?
22   A.    Mr. Wagner.
23   Q.    And for what purpose?
24   A.    Preparation for today's deposition.
25   Q.    Okay.  I'm going to take that down.



Page 139

1      BY MS. WENDELL:

2      Q.    Okay.  So you have no personal knowledge

3  regarding staffing at Oxnard Manor at all at any

4  time; correct?

5      A.    Correct.

6      Q.    Is your knowledge regarding communications

7  between Oxnard and any person or entity mentioning

8  or in any way referring to Kathleen DeSoto limited

9  to the documents sent to you by Avi Wagner?

10     A.    In discussions that I've have with

11 Mr. Wagner, which I don't want to get involved --

12 into, so it's documents plus discussions.

13     Q.    So documents that sent by Mr. Wagner and

14 discussions you had with Mr. Wagner?

15     A.    Correct.

16     Q.    Do you have any knowledge regarding the

17 case that we -- that has been raised in this action

18 entitled Raymond Foreman v Oxnard?

19     A.    Yes.

20     Q.    Okay.  What do you know of that case?

21     A.    I know who plaintiff's counsel was.

22     Q.    Anything else?

23     A.    I got you to laugh a little bit.

24     Q.    Yes.

25     A.    I guess it's -- I guess it's just known in

Page 146

1    in this -- this deposition and --

2        BY MS. WENDELL:

3        Q.    So it's based on the documents received

4    from Mr. Wagner within the last six to seven weeks,

5    and that's it?

6        A.    Correct.

7             And, again, I don't want to get into the

8    content, but -- you know, as well as discussions

9    with counsel.

10       Q.    Well, I need the -- we're entitled to the

11   facts today, because you are a fact witness;

12   correct?  You're a fact witness, Mr. Kaye?

13            MR. WAGNER:   Object -- objection.  Vague

14   and ambiguous.

15            MS. WENDELL:   He's a 30(b)(6) fact witness;

16   correct?

17            MR. WAGNER:   Correct.

18            MS. WENDELL:   I'm sorry?

19            MR. WAGNER:   He's a 30(b)(6) witness.  He's

20   a 30(b)(6) witness, yes.

21       BY MS. WENDELL:

22       Q.    Okay.  And you're here to testify about the

23   facts; correct?

24       A.    Correct.

25       Q.    You are not here as a legal expert?



Page 147

```
 1        A.    Correct.

 2        Q.    Okay.  So is there anything else -- with

 3   respect to No. 41, any other facts, factual basis?

 4        A.    No.  Again, my understanding is that there

 5   were -- as we've gone through this, there was --

 6   there was correspondence that the -- the likelihood

 7   as well as the actual --

 8             (Certified Reporter interrupted for

                clarification of the record.)

 9             THE WITNESS:  As we earlier -- as I earlier

10   testified, there was correspondence with Hallmark

11   that reflected the -- the likelihood of --

12             Are you getting some reverb?  There's some

13   echoing going on.

14             So there was -- notice was -- was provided

15   to Hallmark and they -- they simply didn't respond.

16   They didn't subsequently respond or the only

17   response they said was essentially, you know, it's

18   not our responsibility.

19        BY MS. WENDELL:

20        Q.    Do you have any personal knowledge of that

21   or is it all through the documents from Mr. Wagner?

22        A.    All through the documents.  I mean --

23   again, we all -- you put on the screen here.  You

24   asked me questions about the 28-page denial of

25   coverage letter.  We went through the -- the actual
```



Page 148

1  tendering notices, so yeah, it's in the documents.

2      Q.    Okay.  But you have no firsthand personal

3  knowledge; correct?

4      A.    No.  I did not submit the -- either the

5  request for documents or the -- the actual complaint

6  to -- I did not tender those documents to Hallmark,

7  so, no, I did not.

8      Q.    Okay.  Was you were not involved in the

9  underlying action at all, DeSoto; correct?

10     A.    Correct.

11     Q.    Okay.  What's the next basis for your

12 contention that Hallmark did something wrong beyond

13 its coverage determination?

14     A.    Paragraph 49 through 63.

15         MS. WENDELL:  Okay.  Let's go to 49.

16 BY MS. WENDELL:

17     Q.    For 49, what is the factual basis for that

18 allegation?

19     A.    Well, when you look the DeSoto complaint,

20 and, you know, tease it apart and you'll see that it

21 doesn't allege that DeSoto suffered any injury or

22 occurred any damages as a result of the

23 misrepresentations by plaintiff.

24     Q.    Are you certain?

25     A.    My understanding is that -- that the core



Page 151

1   besides decline their policy, you know, that's

2   essentially -- they didn't -- they didn't fulfill

3   their obligations as an insurer.  They --

4       Q.   Do you -- do you contend that -- is

5   coverage determined by the policy language?

6       A.   I'm not -- I'm not a coverage expert.  I'm

7   not going to claim the nuances of coverage.  I'm

8   speaking to you as -- again, I'm not here as a legal

9   expert.  I'm just here as -- as, you know, as a

10  person from Oxnard, and you're asking my opinion.

11            And my opinion is, if I hired someone to do

12  something, meaning I hired an insurance company to

13  provide services to cover claims and they say, no,

14  thank you, we're not going to cover them, then they

15  completely and utterly failed.  There's nothing more

16  than that they needed to do than to be there.

17            Do you remember in the 1970s and '80s, the

18  old Allstate commerical ads, you know, "Good hands."

19            MS. WENDELL:  Move to strike as

20  nonresponsive.

21       BY MS. WENDELL:

22       Q.   Okay.  Let's go down to 51.

23            What is the factual basis for Oxnard

24  Manor's contention that Hallmark did anything wrong

25  beyond its coverage determination?



Page 158

1             CERTIFICATE OF REPORTER

2             I hereby certify that the witness in the

3     foregoing deposition,

4                 BARRY KAYE, PMK

5     was duly sworn by me to testify the truth, the whole

6     truth, and nothing but the truth, in the within-

7     entitled cause; that said deposition was taken at

8     the time and place herein named; and that a record

9     of the proceedings was made by me, a duly Certified

10    Shorthand Reporter and disinterested person, using

11    machine shorthand, which was thereafter transcribed

12    under my direction.

13            Further, that if the foregoing pertains to

14    the original transcript of a deposition in a Federal

15    Case, before completion of the proceedings, review

16    of the transcript was required.

17            I further certify that I am not of counsel

18    or attorney for either or any of the parties to said

19    deposition, nor in any way interested in the outcome

20    of the cause named in said caption.

21            IN WITNESS WHEREOF, I have hereunto set my

22    hand this 8th day of October, 2023.

23

24    _____

                     JAIMIE PORTER, CSR 13751

25                    State of California



UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

```
                                      )
OXNARD MANOR LP dba OXNARD MANOR      )
HEALTH CENTER; a California Limited   )
Partnership,                          )
                                      )
             Plaintiff,               )
                                      )
      vs.                             )  Case No. 2:23-cv-01322-
                                      )  SPG-MAR
HALLMARK SPECIALTY INSURANCE          )
COMPANY, an Oklahoma corporation,     )
AND DOES 1 through 100, inclusive ,)
                                      )
             Defendants.              )
_____)
```

VIDEOTAPED DEPOSITION OF BARRY KAYE
Tuesday, October 3, 2023
Via Remote Videoconference
VOLUME II

Reported by: Elizabeth Panta, CSR #13163



Page 160

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4                                        )

   OXNARD MANOR LP dba OXNARD MANOR      )

5  HEALTH CENTER; a California Limited)

   Partnership,                         )

6                                        )

                   Plaintiff,            )

7                                        )

            vs.                          ) Case No. 2:23-cv-01322-

8                                        ) SPG-MAR

   HALLMARK SPECIALTY INSURANCE          )

9  COMPANY, an Oklahoma corporation,    )

   AND DOES 1 through 100, inclusive, )

10                                       )

                   Defendants.           )

11 _____) VOLUME II

12

13

14

15        Videotaped deposition of BARRY KAYE, taken on

16  behalf of the defendant, before Elizabeth Panta, CSR

17  No. 13163, for the State of California, commencing

18  at 1:34 PM, Tuesday, October 3, 2023, via remote

19  videoconference.

20

21

22

23

24

25



Page 164

1              MS. WENDELL:  Does the gentleman need to

2    come back and say we're back on the record, or are

3    we just going forward?

4              MR. WAGNER:  I think we've -- I don't

5    think we've ever gone off the record, I don't

6    believe.

7              Drew, have we gone off the record, or are

8    we still on the record?

9              THE VIDEOGRAPHER:  We are still on the

10   record.

11             MR. WAGNER:  Okay.  So we're still on the

12   record.

13

14                    EXAMINATION

15   BY MS. WENDELL:

16     Q    Okay.  Let's go back to the first amended

17   complaint, please.  Okay.

18             MR. WAGNER:  I think you were up to 53.

19             MS. WENDELL:  Yes.  We are on paragraph

20   53.

21             Is he still here?

22             MR. WAGNER:  Yeah.  Mr. Kaye is still

23   there.  He's right there.

24             MS. WENDELL:  I'm not seeing him.

25             MR. WAGNER:  I see him.  He's waving his



Page 192

1      A    No.

2      Q    Are you familiar with an SR Administrative

3  Services?

4      A    No.

5           MS. WENDELL:  Okay.  Mr. Wagner, are you

6  going to produce anybody else today in response to

7  the 30(b)(6) notice of deposition?

8           MR. WAGNER:  No, we are not.

9           MS. WENDELL:  Well, first, I want to thank

10 everybody for their patience.  And I think we're

11 done for today.  I'd like everything done pursuant

12 to code.

13          Would you like a -- Mr. Wagner, would you

14 like a copy?

15          MR. WAGNER:  You could send me -- you

16 know, we don't waive review.  You could send me a

17 copy.  I'll get to the witness to review and sign.

18          MS. WENDELL:  Okay.  And, again, review

19 within the time period pursuant to code.

20          Is there anything else --

21          EXHIBIT TECHNICIAN:  Real quick, I need to

22 clarify something on the record.  This last exhibit

23 would be Exhibit U unless we're not marking the

24 previous exhibit, the proof of service.

25          MS. WENDELL:  We are not marking -- can we



Page 196

1      I, the undersigned, a Certified Shorthand

2  Reporter of the State of California, do hereby

3  certify:

4      That the foregoing proceedings were taken

5  before me at the time and place herein set forth;

6  that any witnesses in the foregoing proceedings,

7  prior to testifying, were duly sworn; that a record

8  of the proceedings were made by me using machine

9  shorthand which was thereafter transcribed under my

10  direction; that the foregoing transcript is a true

11  record of the testimony given.

12      Further, that if the foregoing pertains to

13  the original transcript of a deposition in a Federal

14  Case, before completion of the proceedings, review

15  of the transcript [X] was [ ] was not requested.

16      I further certify I am neither financially

17  interested in the action nor a relative or employee

18  of any attorney or party to this action.

19      IN WITNESS WHEREOF, I have this date

20  subscribed my name.

21

22  Dated: October 9, 2023

23

24                          *Elizabeth Panta*
                            Elizabeth Panta

25                          CSR No. 13163

